# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MARK SOMMER**, on behalf of himself and all others similarly situated, | Civil Case No.: 24-CV-11844 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| **CLEANCHOICE ENERGY, INC.** | |
| Defendant. | **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................ 1

PARTIES ....................................................................................................................... 4

JURISDICTION AND VENUE ..................................................................................... 4

    I.    Subject Matter Jurisdiction ........................................................................ 4

    II.   Personal Jurisdiction ................................................................................... 5

    III.  Venue ......................................................................................................... 5

FACTUAL ALLEGATIONS .......................................................................................... 5

    I.    The History Of Deregulation And ESCOs' Role In Electricity Markets ............... 5

    II.   Plaintiff's Dealings With CleanChoice .......................................................... 7

    III.  CleanChoice's Variable Rates Are Much Higher Than Benchmark Local
          Utility Rates, Even When Accounting For RECs. .......................................... 11

    IV.  CleanChoice's Variable Rates Are Much Higher Than Its Costs To Procure
          Electricity In The Wholesale Market, Even When Accounting For RECS. ......... 15

    V.   CleanChoice's Variable Rates Are Much Higher Than Other ESCOs'
          Rates, Even When Accounting For RECs. ................................................... 19

    VI.  CleanChoice Misleads Its Customers About The Renewable Source Of
          The Electricity It Supplies. ...................................................................... 22

    VII. CleanChoice's Documented History Of Deceptive Business Practices. ............... 24

    VIII. The Abundant Proof That Deceptive Practices Like Those Employed By
          CleanChoice Have Massively Harmed Massachusetts Customers ...................... 27

CLASS ACTION ALLEGATIONS ................................................................................ 36

CAUSES OF ACTION .................................................................................................. 39

COUNT I (Breach Of Contract) ..................................................................................... 39

COUNT II (Violation Of The Massachusetts Consumer Protection Act,
Mass. Gen. Laws Ch. 93a, §§1, Et Seq.) ....................................................................... 42

COUNT III (Unjust Enrichment) ................................................................................... 47

PRAYER FOR RELIEF ................................................................................................. 48

Plaintiff Mark Sommer ("Plaintiff"), by his attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and Wittels McInturff Palikovic, brings this proposed class action in his individual capacity, and on behalf of a class of consumers defined below, against Defendant CleanChoice Energy, Inc. (hereinafter "CleanChoice" or "Defendant") and hereby alleges the following with knowledge as to his own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.     Defendant CleanChoice is an independent energy service company ("ESCO") that sells residential and commercial electricity in Massachusetts' deregulated retail electricity market.  This action seeks to redress CleanChoice's deceptive and bad faith marketing and pricing practices that have caused thousands of residential and commercial customers in Massachusetts to pay considerably more for their electricity than they should otherwise have paid.

2.     Defendant has taken advantage of the deregulation of Massachusetts' retail electricity market by misrepresenting how its electricity rates are calculated.  CleanChoice also takes advantage of environmentally conscious consumers by promising to provide electricity from renewable sources when it does no such thing.  Among other conduct challenged in this action, CleanChoice makes these false and deceptive claims in the customer contracts and enrollment materials CleanChoice provides to Massachusetts customers.

3.     Specifically, CleanChoice uniformly represents in its customer contract that the variable electricity rate Massachusetts customers pay will be calculated "based on market conditions and CleanChoice Energy's costs to provide energy supply service – [customers'] future monthly prices may be higher or lower than the introductory price."

1

4.      CleanChoice's representation regarding how its variable electricity rate is determined is false and deceptive, and designed to take advantage of consumers' good faith and their lack of knowledge about, and access to, accurate wholesale and retail energy pricing information.  In reality, CleanChoice did not calculate customers' variable electricity rates based on market conditions and its costs to provide customers' energy supply.  Instead, it engages in rampant price gouging, and its rates are not "based on" its costs to provide energy supply service and market conditions.  And CleanChoice's representation that customers' future monthly prices *may* be higher than the introductory price is literally false because its subsequent rates are *always* higher than the introductory rates.

5.      In addition, CleanChoice misleads its customers about the nature of the energy it supplies by representing that 100% of the electricity it supplies is from renewable sources when it is not.

6.      Specifically, CleanChoice represents in its customer enrollment form that customers who sign up will be purchasing "electricity from renewable resources provided by CleanChoice Energy" and that CleanChoice sells "100% renewable energy."  CleanChoice also represents in its customer contract that the energy it provides "include[s] 100% renewable energy resources."  Each of CleanChoice's three statements about the source of its electricity are false and deceptive because the electricity CleanChoice supplies is the same "brown" electricity sourced from the exact same place as the electricity provided by customers' existing utilities.  In fact, the electricity CleanChoice's customers consumer *is* the exact same electricity their local utility would have provided had the customer not switched to CleanChoice.

7.      In the small print of its contracts, CleanChoice claims that it pairs customers' electricity consumption with renewable energy certificates ("RECs") that represent the

2

production of renewable energy by a third party. Purchasing RECs to offset burning "brown" electricity is not the same as providing "electricity from renewable resources" or providing "100% renewable energy" directly to customers' homes.

8.     Indeed, it is not possible for ESCOs to supply their customers with an energy mix that is any different from what customers' existing utility supplies and delivers on the ESCOs' behalf. An ESCO like CleanChoice cannot divert the brown energy a customer would otherwise receive and then replace that energy with renewable energy sourced by the ESCO.

9.     As a result of these misleading representations and the other unlawful and unauthorized acts described herein, thousands of unsuspecting Massachusetts customers have been, and continue to be, fleeced by CleanChoice out of millions of dollars in exorbitant charges for electricity.

10.     Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous. Exorbitant energy prices have devastating consequences for families struggling from month-to-month to pay for utility bills, rent or the mortgage, auto loans, food, medicine and other necessities. When there is not enough in the budget to meet these basic needs, families may face disconnection from vital utility service, cutting back on food and healthcare, and other strategies that can harm the health, safety and well-being of vulnerable families.

11.     Plaintiff and other CleanChoice customers (the "Class") have been injured by Defendant's unlawful and unauthorized practices. Plaintiff and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for CleanChoice's breach of contract, breach of the duty of good faith and fair dealing, violation of Massachusetts consumer protection law, and unjust enrichment.

12. Only through a class action can CleanChoice's customers remedy Defendant's ongoing wrongdoing. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge CleanChoice's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, customers do not realize they are victims of CleanChoice's deceptive and unlawful conduct. With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like CleanChoice engage in fair and upright business practices.

## PARTIES

13. Plaintiff Mark Sommer resides in Cambridge, Massachusetts. Plaintiff Sommer signed up with CleanChoice in or around September of 2019, and he did so expecting to receive electricity solely from renewable sources provided by CleanChoice Energy at a reasonable cost. Soon after switching to CleanChoice, Plaintiff Sommer was charged an exorbitant monthly variable electricity rate. Plaintiff canceled his CleanChoice service and his last CleanChoice bill was in March 2023.

14. As a result of Defendant's deceptive and otherwise improper and unauthorized conduct, Plaintiff incurred excessive charges for electricity.

15. Defendant CleanChoice Energy Corp. is a Maryland corporation headquartered at 1055 Thomas Jefferson St. NW, Washington, DC 20007.

## JURISDICTION AND VENUE

### I.    Subject Matter Jurisdiction

16. This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class

exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

## II.    Personal Jurisdiction

17.    This Court has specific personal jurisdiction over Defendant because it purposefully directed its conduct into this jurisdiction by advertising, marketing, distributing, and selling electricity to Plaintiff and other Massachusetts consumers, and Plaintiff's claims against Defendant arise from Defendant's conduct in Massachusetts.

## III.    Venue

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).  Substantial acts in furtherance of the alleged improper conduct occurred within this District.  CleanChoice supplied electricity to Plaintiff's residence, which is located in Cambridge, Massachusetts.

## FACTUAL ALLEGATIONS

## I.    The History Of Deregulation And ESCOs' Role In Electricity Markets

19.    In the late 1990s, numerous state legislatures and state regulatory agencies deregulated the market for retail energy supply.  Massachusetts deregulated its electricity market in 1997.  St. 1997, c. 164, § 1(a).  Among the goals of deregulation were increased competition, with an eye towards reducing energy rates consumers and small businesses pay.  As a result, the Massachusetts electricity supply market is open to competition, and consumers and small businesses may choose their energy supplier.

20.    ESCOs, the new independent energy suppliers, compete primarily against local utilities.  ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then sell that energy to end-user customers.  However, ESCOs do not ***deliver*** energy to customers' homes and businesses, and many do not produce electricity or natural gas.  Rather,

the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. ESCOs merely buy electricity and gas at wholesale and then resell that energy to end-users with a mark-up. Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs.

21.     ESCOs are subject to minimal regulation by state utility regulators like the Massachusetts Department of Public Utilities. ESCOs like CleanChoice do not have to file their rates with regulators, or the method by which those rates are set.

22.     Customers who do not switch to an ESCO for their energy supply continue to receive supply from their local utility. Under Massachusetts law, electricity supply is procured in a competitive market. Utilities like EverSource acquire electricity supply through a competitive bidding process, and they pass that cost directly to their customers with a small markup to account for the utility's incremental overhead costs and adjustments when necessary as stipulated in their tariffs. Accordingly, the rates utilities like EverSource charge for supply is an ideal proxy for a variable monthly electricity rate that is based on market conditions and the costs to provide energy supply service.

23.     ESCOs such as CleanChoice can use the same competitive markets utilities use, and they have more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing energy in advance of the time it is used by customers, for example by purchasing futures contracts for the delivery of electricity and gas in the future at a predetermined price. The fundamental purpose

of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce energy acquisition costs and pass those savings on to customers.

24.    Because of their increased flexibility and lower overhead, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do.  Yet CleanChoice's variable rates are consistently and substantially higher than the local utility's rates and are not based on its costs to provide energy supply service and market conditions; accordingly, no consumer would ever agree to CleanChoice's variable rate if they knew the truth. The only way CleanChoice can retain variable rate customers is by hiding the fact that the driving factor behind its variable rate is not CleanChoice's costs to provide energy supply service and market conditions, but CleanChoice's unbridled price gouging and profiteering (even when accounting for the additional cost CleanChoice incurs to buy RECs).

25.    CleanChoice took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates for electricity.  In theory, energy deregulation allows customers to shop for the best energy rates, and it allows customers to take advantage of market-based rates that decline when the wholesale cost of energy declines.  However, CleanChoice exploits deregulated markets by consistently charging its customers far more than the local utility for the same energy and failing to adequately disclose the truth about how its variable rates are determined.

## II.    Plaintiff's Dealings With CleanChoice

26.    In 2019, CleanChoice began supplying electricity to Plaintiff's residence. Plaintiff continued to receive electricity from CleanChoice until March of 2023.

27.    As part of Plaintiff's enrollment, he signed CleanChoice's enrollment form, which states that customers who sign up with CleanChoice will be purchasing "electricity from

renewable resources provided by CleanChoice Energy" and that CleanChoice sells "100% renewable energy."

28.    That same enrollment form states that CleanChoice's customer contract is enclosed.  Plaintiff did not keep a copy of the enclosed contract but in 2023 Plaintiff contacted CleanChoice and requested his contract.  CleanChoice sent him what it claimed represented the terms the parties agreed to when Plaintiff signed up.   CleanChoice represents in that contract that the energy it provides "include[s] 100% renewable energy resources."  Upon information and belief, this contract is CleanChoice's standard form customer agreement for Massachusetts customers.

29.    CleanChoice represented to Plaintiff in its standard form customer agreement that its variable rate for electricity is "subject to change monthly, based on market conditions and CleanChoice Energy's costs to provide energy supply service – [customers'] future monthly prices may be higher or lower than the introductory price."

30.    Upon information and belief, Plaintiff was subject to the same contractual terms for his variable rate for electricity as CleanChoice's other Massachusetts customers.

31.    In light of the representations in CleanChoice's customer contract about how its variable rates are calculated, any reasonable customer, including Plaintiff, would reasonably expect that CleanChoice's variable rates would reflect CleanChoice's costs to procure and provide the energy it sells to customers, and certainly would not be substantially higher than those costs.  CleanChoice's contract represents that its rates are "based on" just two identifiable criteria.  "Market conditions" and "CleanChoice Energy's costs to provide energy supply service."  The term "based on" provides exclusivity and precludes CleanChoice's rate-setting discretion such that its variable electricity rates can be determined solely by the two criteria

listed in the contract.  Reasonable consumers understand that when you make a calculation "based on" specific factors, you take only those factors into account; the calculation is made "relying on" or "building on" those factors.  For example, you calculate a baseball player's batting average "based on" that player's number of hits and number of at bats—nothing more and nothing less.  The area of a rectangle is calculated "based on" its width and length, while velocity is calculated "based on" distance and time.  Here, CleanChoice's use of the term "based on" limits the calculation of rates to the two enumerated factors: (1) "market conditions" and (2) "CleanChoice Energy's costs to provide energy supply service."  An assessment of those two factors, however, shows that CleanChoice did not base customers' rates on those two factors and instead added exorbitant and fluctuating markups.

33.    The term "market conditions" means the cost to procure energy in the wholesale market from which CleanChoice buys electricity for its customers.  The terms "CleanChoice Energy's costs to provide energy supply service" means the minimal additional fixed overhead expenses CleanChoice incurs to provide the customer's energy.

33.    Unfortunately, CleanChoice did not provide its customers with rates that are "based on" the contract's two enumerated factors, even when accounting for the costs of RECs. Instead, CleanChoice charges its customers variable rates that are untethered from these factors to maximize its own profits.  Upon information and belief, and despite the rate-setting formula set forth in its customer contract, CleanChoice did not perform rate calculations reflecting the two limited factors listed in its contract.  Upon information and belief, CleanChoice performed no calculations that build up to a rate that complies with its contract's pricing formula.

34.    In addition, CleanChoice misrepresents the source of its electricity in both its customer enrollment form and customer contract.  Rather than producing renewable electricity

(for example by using wind and solar energy) or procuring energy from wind and solar energy producers, CleanChoice simply purchases wholesale electricity from the same market used by customers' utilities and buys additional renewable energy credits that represent the production by another entity of wind and solar energy in the form of RECs (production that would occur whether or not CleanChoice bought the RECs).  CleanChoice then deceptively markets its electricity as coming from renewable sources and justifies its price gouging for this "brown" electricity by repackaging as energy from renewable sources.  CleanChoice's costs associated with purchasing RECs are minimal compared to the cost of procuring electricity a wholesale, and RECs costs cannot explain CleanChoice's exorbitant rates.  Indeed, during the 2019 to 2023 time period Plaintiff was a CleanChoice customer, the cost to purchase a corresponding REC was never materially more than 4 cents per kilowatt hour (kWh).  CleanChoice may have even paid less than 4 cents per kWh for the RECs paired with Plaintiff's electricity purchases.  As the Massachusetts Attorney General and the mayor of Boston recently noted, ESCOs like CleanChoice "routinely claim that the energy they sell helps Massachusetts achieve its clean energy goals," but "nothing could be further from the truth" because "[t]heir supply is commonly backed by cheap out-of-state energy credits that do nothing to help the Commonwealth or region achieve its ambitious and critical greenhouse gas reduction goals."[1]  Unlike the energy sources relied on by utilities to meet their statutorily required Renewable Portfolio Standards, the sources for ESCOs' additional unbundled RECs "are not subject to regulatory scrutiny."[2]

---

[1] Andrea J. Campbell & Michelle Wu, *Massachusetts should ban third-party electric suppliers*, BOSTON GLOBE (Jan. 29, 2024), https://www.bostonglobe.com/2024/01/29/opinion/michelle-wu-andrea-campbell-third-party-electric-suppliers-ban/.

[2] Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to an Analysis of the Individual Residential Electric Supply Market in Massachusetts*, MASSACHUSETTS ATTORNEY GENERAL'S OFFICE (May 2023),

35.     Other than a desire to promote or use renewable energy, price is the most important consideration for potential CleanChoice consumers.  Given that there is no difference at all in the electricity that ESCOs supply as opposed to the consumer's local utility, the only reason a consumer would switch to CleanChoice is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility, plus a willingness to pay the costs of RECs.

### III.    CleanChoice's Variable Rates Are Much Higher Than Benchmark Local Utility Rates, Even When Accounting For RECs.

36.     The local utility's rates, like EverSource's (the utility serving Plaintiff's residence), serve as an ideal indicator of the wholesale cost of energy, the rates other retailers charge their customers in the same market, and the minimal additional fixed overhead expenses CleanChoice incurs to provide energy supply service.  In other words, the local utility's rate serves as an ideal benchmark for a variable monthly electricity rate that is "based on" the two pricing factors set forth in CleanChoice's customer contract.  The utility's rates reflect the wholesale cost of energy that are the same costs ESCOs like CleanChoice incur.  In fact, Defendant has a tactical advantage over the utility as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) utility rates, albeit over a longer term.  Therefore, while the utility's rates might not precisely match Defendant's rates, the latter's rates should hew closely to the utility's rates and over time should be roughly similar.  Instead, CleanChoice's rates were wildly incongruent.

---

https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download.

37.    Similarly, the utility is CleanChoice's primary competitor in Plaintiff's service territory and its rates thus reflect the rates other retailers charge their customers in the same market.

38.    The following table compares Plaintiff's variable electricity supply rates from CleanChoice for twenty-four billing periods (from bills accessible to Plaintiff) to his local utility EverSource's contemporaneous supply rate. The table below also calculates the differences between CleanChoice's rates and the EverSource rate ("Overcharge Multiplier").

| Billing Period | CleanChoice Rate (Cents per kWh) | EverSource's Rate (Cents per kWh) | Overcharge Multiple |
|---|---|---|---|
| 07/2020-08/2020 | 19.70 | 8.95 | 2.2X |
| 08/2020-09/2020 | 19.70 | 9.255 | 2.1X |
| 01/2021-02/2021 | 19.60 | 12.939 | 1.5X |
| 06/2021-07/2021 | 19.30 | 9.84 | 2.0X |
| 07/2021-08/2021 | 21.70 | 9.800 | 2.2X |
| 08/2021-09/2021 | 22.20 | 10.13 | 2.2X |
| 09/2021-10/2021 | 23.50 | 10.50 | 2.2X |
| 10/2021-11/2021 | 27.30 | 11.26 | 2.4X |
| 11/2021-12/2021 | 29.30 | 12.55 | 2.3X |
| 12/2021-01/2022 | 33.60 | 18.84 | 1.8X |
| 01/2022-02/2022 | 34.10 | 21.405 | 1.6X |
| 02/2022-03/2022 | 32.10 | 17.03 | 1.9X |
| 03/2022-04/2022 | 31.10 | 13.60 | 2.3X |
| 04/2022-05/2022 | 34.80 | 11.87 | 2.9X |

| Billing Period | CleanChoice Rate (Cents per kWh) | EverSource's Rate (Cents per kWh) | Overcharge Multiple |
|---|---|---|---|
| 05/2022-06/2022 | 39.20 | 10.49 | 3.7X |
| 06/2022-07/2022 | 40.40 | 15.02 | 2.7X |
| 07/2022-08/2022 | 41.60 | 16.824 | 2.5X |
| 08/2022-09/2022 | 40.60 | 15.71 | 2.6X |
| 09/2022-10/2022 | 42.10 | 14.988 | 2.8X |
| 10/2022-11/2022 | 46.30 | 17.01 | 2.7X |
| 11/2022-12/2022 | 50.00 | 22.661 | 2.2X |
| 12/2022-01/2023 | 59.70 | 34.75 | 1.7X |
| 01/2023-02/2023 | 59.70 | 39.156 | 1.5X |
| 02/2023-03/2023 | 17.90 | 27.99 | 0.6X |

39.     EverSource's supply rates, charged to those customers in Plaintiff's geography who do not select an ESCO, reflect market conditions and the additional costs it takes a supplier to provide the customer with energy supply.  As explained above, EverSource is CleanChoice's primary competitor in Plaintiff's service territory, and EverSource's rates are passthroughs of the wholesale market price of electricity and associated costs over time (the same costs that ESCOs like Clean Choice incur), making it an ideal comparator.

40.     Considering CleanChoice's representation in its customer contract about how its rates are calculated, no reasonable customer, including Plaintiff, would expect CleanChoice's variable rate to be artificially inflated beyond any resemblance to the local utility's costs, even accounting for the costs of RECs.  Indeed, the fact that CleanChoice's rates were usually *double*,

and sometimes almost **triple**, EverSource's rates demonstrates the extent of its unscrupulous price gouging.

41.    Moreover, the fact that EverSource's rates decline while CleanChoice's increase demonstrates that CleanChoice does not set its rates based on market conditions or its costs to supply the customer.  For example, from January to June 2022, Eversource's rate declined by more than 50% (from 21.41 cents/kWh to 10.49 cents/kWh) while CleanChoice's rate increased from 34.10 cents/kWh to 39.20 cents/kWh.

42.    The disconnect between EverSource's rates and CleanChoice's rates further demonstrates that CleanChoice's rates are not even remotely based on market conditions and CleanChoice's costs to provide energy supply service.  For all but one of the twenty-four billing cycles presented, CleanChoice's rates never even approached EverSource's.

43.    CleanChoice should have been able to procure electricity at a lower cost than the utility given its tactical advantages over EverSource.  As explained above, CleanChoice can purchase electricity from any number of sources using a variety of purchasing and hedging strategies.  Its cost for purchasing electricity, therefore, should have at least closely tracked, if not undercut, EverSource's prices. CleanChoice's overhead costs (which are relatively minor compared to its electricity supply costs) also cannot explain the high variable rates it charged. Indeed, EverSource's rates include additional amounts to account for its overhead, yet CleanChoice's rates are far higher.  Upon information and belief, CleanChoice's supply-related overhead costs are lower than the traditional utility's supply-related overhead costs.

**IV.    CleanChoice's Variable Rates Are Much Higher Than Its Costs To Procure
Electricity In The Wholesale Market, Even When Accounting For RECS.**

44.    One of the two factors CleanChoice's contract promises to base variable rates on
is "market conditions," which means the cost to procure energy in the wholesale market from
which CleanChoice buys electricity for its customers.

45.    However, CleanChoice's variable rates are much much higher than wholesale
market prices in Massachusetts.  The cost of wholesale electricity is the primary component of
the non-overhead costs CleanChoice incurs, and CleanChoice's additional overhead costs to
provide energy supply service to customers is small compared to its electricity procurement
costs.

46.    A comparison of CleanChoice's rates to prevailing market costs, including the
cost to procure RECs, further demonstrates that CleanChoice does not charge a rate based on
"market conditions" and "CleanChoice Energy's costs to provide energy supply service."

47.    The table below identifies (i) twenty-four billing periods during which Plaintiff
was enrolled in CleanChoice's variable rate for electricity services, (ii) the variable rate
CleanChoice charged Plaintiff, (iii) the corresponding "Market Supply Costs," and (iv) the
differences between CleanChoice's rates and the contemporaneous Market Supply Costs
("CleanChoice's Multiplier").

48.    The Market Supply Costs below are based on the costs that an ESCO incurs
supplying a retail customer for each period.  The Market Supply Costs include the weighted
day-ahead Independent System Operator New England ("ISO-NE") prices in Plaintiff's utility
zone, ancillary services costs, capacity costs, RECs sufficient to correspond to 100% of the
electricity CleanChoice supplies, and various relatively-small charges related to the
ISO-NE.  These charges are tracked by ISO-NE's Market Monitor, the external consultant that

independently evaluates the New England wholesale electricity market. ISO-NE's Market Monitor is appointed pursuant to ISO-NE's Federal Energy Regulatory Commission regulation and tariff.

49.    The Market Supply Costs represent the supply costs that CleanChoice and other ESCOs incur in providing energy to retail customers. Each of these measures reflects the costs that CleanChoice's competitors, in the regulated or deregulated markets, incur. That CleanChoice's rates are so vastly different from the Market Supply Costs demonstrate that CleanChoice's rates are not based on market conditions and CleanChoice Energy's costs to provide energy supply service.

| Billing Period | CleanChoice Rate (Cents per kWh) | Market Supply Costs (Cents per kWh) | CleanChoice's Multiplier |
|---|---|---|---|
| 07/2020-08/2020 | 19.70 | 9.35 | 2.1X |
| 08/2020-09/2020 | 19.70 | 8.83 | 2.2X |
| 01/2021-02/2021 | 19.60 | 14.04 | 1.4X |
| 06/2021-07/2021 | 19.30 | 10.49 | 1.8X |
| 07/2021-08/2021 | 21.70 | 10.86 | 2.0X |
| 08/2021-09/2021 | 22.20 | 11.45 | 1.9X |
| 09/2021-10/2021 | 23.50 | 12.07 | 1.9X |
| 10/2021-11/2021 | 27.30 | 11.85 | 2.3X |
| 11/2021-12/2021 | 29.30 | 13.19 | 2.2X |
| 12/2021-01/2022 | 33.60 | 17.51 | 1.9X |
| 01/2022-02/2022 | 34.10 | 20.12 | 1.7X |
| 02/2022-03/2022 | 32.10 | 13.87 | 2.3X |

| Billing Period | CleanChoice Rate (Cents per kWh) | Market Supply Costs (Cents per kWh) | CleanChoice's Multiplier |
|---|---|---|---|
| 03/2022-04/2022 | 31.10 | 12.51 | 2.5X |
| 04/2022-05/2022 | 34.80 | 13.47 | 2.6X |
| 05/2022-06/2022 | 39.20 | 13.44 | 2.9X |
| 06/2022-07/2022 | 40.40 | 12.84 | 3.1X |
| 07/2022-08/2022 | 41.60 | 17.26 | 2.4X |
| 08/2022-09/2022 | 40.60 | 14.27 | 2.8X |
| 09/2022-10/2022 | 42.10 | 11.59 | 3.6X |
| 10/2022-11/2022 | 46.30 | 11.21 | 4.1X |
| 11/2022-12/2022 | 50.00 | 14.84 | 3.4X |
| 12/2022-01/2023 | 59.70 | 14.92 | 4.0X |
| 01/2023-02/2023 | 59.70 | 10.32 | 5.8X |
| 02/2023-03/2023 | 17.90 | 9.86 | 1.8X |

50.    Again, CleanChoice's variable rates are consistently and substantially higher than a rate based on its market supply costs, which further demonstrates that CleanChoice's rates are not set in accordance with its contract's pricing formula.

51.    CleanChoice's rates are higher than the Market Supply Costs for all months and are on average 2.6 times higher than the Market Supply Costs. During this period, CleanChoice charged Plaintiff a rate that was a staggering 5.8 times higher than its Market Supply Costs. In other words, CleanChoice marked up its price to obtain more than a 400% margin. This is classic price gouging.

52.    As with the comparison to EverSource's prices, CleanChoice's rates likewise fail to fluctuate in accordance with Market Supply Costs.  For example, from July 2022 to February 2023, the Market Supply Cost dropped 40% (from 17.26 cents/kWh to 10.32 cents/kWh), but CleanChoices rate rose 43% (from 41.60 cents/kWh to 59.70 cents/kWh).

53.    The cost of wholesale electricity is the primary component of the non-overhead costs CleanChoice incurs.  The other components of CleanChoice's procurement costs (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are relatively insignificant in terms of the overall costs Defendant incurs to provide retail electricity, and do not substantially fluctuate over time.  These costs are also reflected in EverSource's rates.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates.  Nor does the cost of purchasing RECs explain CleanChoice's exorbitant rates.

54.    Therefore, Defendant's cost to procure energy in the wholesale market (plus additional REC costs) cannot explain Defendant's egregiously high variable rate or the reason its rates are disconnected from changes in wholesale costs. Further, and as discussed above, CleanChoice's costs to provide energy supply service to customers (which are relatively minor compared to electricity procurement costs) also cannot explain the high variable rates charged, as CleanChoice's own fixed rates, which are significantly lower than its variable rates, demonstrate. For example, from July 2022 to July 2024, CleanChoice's average variable rate for Eversource customers was 45¢ per kilowatt hour.[3]  CleanChoice's fixed rates for those same customers is much lower.  Indeed, CleanChoice's current July 2024 fixed rate for Eversource customers is

---

[3] *See Disclosure Statement:  Historical Pricing of Variable Rates in Eversource*, CLEANCHOICE ENERGY, https://cleanchoiceenergy.com/historic/179 (last visited July 15, 2024).

18.1 ¢ per kilowatt hour.[4]  In June 2023, CleanChoice's fixed rate offer for Eversource customers in Cambridge was 15¢ per kilowatt hour.

**V.    CleanChoice's Variable Rates Are Much Higher Than Other ESCOs' Rates, Even When Accounting For RECs.**

55.    CleanChoice routinely charges its customers variable rates for electricity that are amongst the highest offered by ESCOs in Massachusetts.  According to data from the U.S. Energy Information Administration, CleanChoice charged it customers the highest price among 44 ESCOs in 2019, the second highest price of 39 ESCOs in 2020, the second highest price of 45 ESCOs in Massachusetts in 2021, and the second highest price of 45 ESCOs in Massachusetts in 2022.  CleanChoice's prices were 32% higher than average in 2019, 24% higher than average in 2020, 30% higher than average in 2021, and 43% higher than average in 2022.[5]  These other ESCOS have similar costs and overhead expenses to those CleanChoice incurs.

56.    CleanChoice claims it buys RECs to offset 100% of its customers electricity use. But the costs to buy those RECs does not explain why its rates are so much higher than other ESCOs' rates given that they otherwise incur the same costs (including overhead and profit).  For example, in 2022, all electricity suppliers in Massachusetts we required to provide 20% of their electricity supply from renewable sources.  RECs cost 4.1 cents per kilowatt hour in 2022; therefore, CleanChoice did not incur more than 3.8 additional cents per kilowatt hour in costs to supply 100% offsetting RECs as opposed to 20% offsetting RECs.  Yet CleanChoice's average price in Massachusetts for 2022 was 25.6 cents per kilowatt hour.  The average price ESCOS

---

[4] *See Here's what clean electricity plan is available for 02138*, CLEANCHOICE ENERGY, https://cleanchoiceenergy.com/plans?area=02138&submitted_by=%2F&edcId=223&area=02138 (last visited July 15, 2024).

[5] *See Electric Sales, Revenue, and Average Price*, U.S. ENERGY INFORMATION ADMINISTRATION, Table 12, https://www.eia.gov/electricity/sales_revenue_price/ (last visited July 15, 2024).

charged in Massachusetts was 14.22 cents per kilowatt hour (making CleanChoice's average rate 80% higher), far more than a REC cost can account for.

57.    CleanChoice knew that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, other than the minimal cost of additional RECs.

58.    CleanChoice knew that its variable rates were consistently and significantly higher than the local utility's rates and those of other ESCOs, even when accounting for RECs.

59.    CleanChoice knew in advance what variable rates it would charge its customers.

60.    CleanChoice knew the conditions that must be present for their variable rate customers to save money compared to what the customer's existing utility would have charged.

61.    Contrary to the pricing methodology in CleanChoice's contract, CleanChoice had a different methodology it used to calculate its variable rates, which it did not disclose to consumers.

62.    Defendant's failure to adequately disclose the material facts listed in the prior five paragraphs were material omissions and these omissions were materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

63.    Accordingly, and in addition to the material misrepresentations described above, CleanChoice lulled consumers into purchasing its energy supply via at least five material omissions about its variable energy rates.  Defendant did so to reap excessive profits at the expense of unsuspecting consumers.  Defendant acted with actual malice, or wanton and willful disregard, for consumers' well-being.

64.     No reasonable consumer would expect that CleanChoice would charge them more than the utility by so much money for so long.

65.     Thus, CleanChoice's omissions with respect to the rates it would charge were materially misleading.

66.     In this case, CleanChoice knew that once it had acquired the consumer's energy account, it could charge high energy rates and many consumers (if not most) would not know, and simply pay the exorbitant charges, month after month.

67.     It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[6] and "Nudges."[7]

68.     Defendant's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that consumers will compare CleanChoice's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.  As New York's energy regulator has observed, "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[8]

---

[6] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler, *Endowment Effect, Loss Aversion, and Status Quo Bias*, THE JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 5, pp. 193–206 (1991).

[7] R. Thaler and S. Sunstein, NUDGE, (Yale University Press. 2008).

[8] CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 11, N.Y. Pub. Servs. Comm'n (Feb. 25, 2014).

**VI.     CleanChoice Misleads Its Customers About The Renewable Source Of The Electricity It Supplies.**

69.     CleanChoice also obtains customers by misleading them about the source of the energy it supplies.

70.     As part of its enrollment process, CleanChoice mails prospective customers marketing materials that come with an authorization form.  As with its other customers, the authorization form sent to Plaintiff included a place for Mr. Sommer to sign a statement that said "I am the account holder and authorize CleanChoice Energy to enroll my address shown at left for 100% renewable energy."  That same form also urges customers to "[r]eturn this form in the postage-paid envelope enclosed to obtain your electricity from renewable sources provided by CleanChoice Energy."

71.     The customer contract CleanChoice entered into with Plaintiff represents that the energy it provides "include[s] 100% renewable energy resources."

72.     While Mr. Sommer does not have a copy of the marketing materials that accompanied the authorization form he signed, on information and belief, the marketing materials CleanChoice sent Mr. Sommer are the same as those it sends its other customers.

73.     In those marketing materials, CleanChoice represents that customers who switch will get "100% clean, pollution-free energy," that "CleanChoice Energy will source wind and solar power from farms in your region," and that it will "obtain your electricity from renewable sources provided by CleanChoice Energy."

74.     The CleanChoice statements chronicled in the four paragraphs above are false and deceptive because the energy actually supplied by CleanChoice and delivered to customers is not "from renewable sources provided by CleanChoice Energy," from "wind and solar power from farms in your region," or "from renewable sources provided by CleanChoice Energy."

CleanChoice's energy is also not 100% clean, 100% renewable, or 100% pollution free.  Instead, the actual energy supplied to CleanChoice customers' meter is the same "brown" energy the customer would get if supplied by the utility.  The only difference is that CleanChoice claims (in hidden fine print of its customer contract) to also purchase RECs to offset the "brown" energy the customer actually uses.  However, the purchase of RECs does not make the "brown" energy supplied to CleanChoice customers' meter somehow from a renewable "source."  Nor do RECs make CleanChoice's electricity "100% renewable," "100% clean," or 100% pollution free.  The more CleanChoice energy a customer uses, the more ***non-renewable*** resources they are using and the ***more*** pollution they create.

75.    As the staff of New York's energy regulator made clear, in connection with New York's market which is structured in the same way, "[t]he fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity" and that "in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a 'green' commodity product."[9]

76.    CleanChoice customers are not "obtain[ing] [their] electricity from renewable sources provided by CleanChoice Energy," as Defendant falsely claims.  Rather, they are getting the same brown energy they would have gotten from the utility.  CleanChoice's purchase of RECs does not mean that customers are somehow "obtain[ing] [their] electricity from renewable sources provided by CleanChoice Energy."

---

[9] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 69–70, N.Y. Pub. Servs. Comm'n (Mar. 30, 2018).

77.     Plaintiff and other CleanChoice customers were injured by CleanChoice's deceptive claims about the source of its energy.  Customers are willing to pay more to actually receive their electricity from 100% renewable sources, and they are injured by paying the premium associated with such electricity when they do not receive it.  Customers are also deprived of the benefit of their bargain because electricity actually supplied from 100% renewable sources is much more valuable than the brown energy CleanChoice provides. Customers including Plaintiff who knew the truth about the source of CleanChoice's electricity would not purchase it and thus would not incur CleanChoice's exorbitant charges.

78.     Given that Defendant has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of CleanChoice's last wrongful act against Plaintiff when CleanChoice last charged Plaintiff substantially more for electricity than the local utility.

**VII.   CleanChoice's Documented History Of Deceptive Business Practices.**

79.     CleanChoice has a long record using deceptive marketing and sales practices, which a 2022 investigative report describes as "a disturbing pattern of behavior" built upon "a fundamentally misleading for-profit business model that capitalizes on a lack of popular understanding about how electrical grids operate."[10]

80.     Indeed, just last year, CleanChoice paid $600,000 in a settlement[11] with the staff of the Illinois Commerce Commission and two consumer advocacy organizations that alleged

---

[10] William Bredderman, *Critics Say CleanChoice Energy, Founded By Political Operatives, Targets Eco-Conscious Consumers With Misleading Promotions*, DAILY BEAST (Mar. 29, 2022, 4:05 AM), https://www.thedailybeast.com/cleanchoice-energy-is-the-sneaky-green-energy-company-that-pisses-off-climate-do-gooders.

[11] Settlement Agreement, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, Ill. Com.

that "CleanChoice asks customers to pay a premium for grid power matched with Renewable

Energy Credits (RECs), but fails to provide critical information, such as what type of RECs are

being offered, where the RECs were generated, and the 'price to compare' (the default utility's

current supply price).  Without this information, customers cannot evaluate the costs and benefits

of these offers."[12]

81.      CleanChoice's practices have also caught the attention of other state and local

officials over the years.  For example, in 2017, the Town of Acton, Massachusetts alerted the

Massachusetts Department of Public Utilities that CleanChoice was running "a misleading

marketing campaign," by sending advertisements to residents and "creating the impression that it

is a government communication."[13]

82.      In 2016, CleanChoice (then operating under the name "Ethical Electric")[14] entered

into an Assurance of Voluntary Compliance ("AVC") with the Illinois Attorney General in a

matter that alleged that CleanChoice improperly marketed its electricity as "green" when it was

really just supplying "brown" energy paired with the use of RECs as offsets, and that it claimed its

price was comparable to the local utility when it was "routinely more than 5 percent higher."[15]

---

Comm'n, No. 20-0499 (Mar. 7, 2023),
https://web.archive.org/web/20230811220824/https://www.icc.illinois.gov/docket/P2020-
0499/documents/335456/files/584468.pdf.

[12] Verified Formal Complaint at 1, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, Ill.
Com. Comm'n, No. 20-0499 (May 29, 2020), https://www.icc.illinois.gov/docket/P2020-
0499/documents/300091/files/523255.pdf.

[13] Letter from Steven L. Ledoux, Town Manager of Action, to Nancy Stevens, Director, Mass.
Dep't Pub. Utils. (Aug. 4, 2017), https://www.actonma.gov/DocumentCenter/View/3921/Letter-
of-Complaint---Mass-Dept-Public-Utilities?bidId=.

[14] *Ethical Electric Is Now CleanChoice Energy,* CLEANCHOICE ENERGY, (Oct. 31, 2016),
https://cleanchoiceenergy.com/news/cleanchoice_energy_announcement.

[15] *Lisa Madigan, Ill. Att'y Gen., Madigan Reaches Settlement With Ethical Electric For
Misleading Marketing About Its Renewable Energy Product* (Aug. 8, 2016),
https://web.archive.org/web/20160819020816/http://www.ag.state.il.us/pressroom/2016_08/2016

Specifically, the Illinois Attorney General's action stemmed from CleanChoice's direct mail solicitations promoting its "Clean Energy Option" product as powering customers' homes with electricity generated exclusively from renewable energy sources like wind and solar. In truth, however, the electricity provided was simply electricity from the electric grid that was then paired with RECs. As part of the AVC, CleanChoice agreed to make $3 million available to customers.[16]

83.    And in 2015, CleanChoice (again operating under the "Ethical Electric" name) entered into an AVC with the Pennsylvania Attorney General for misleading customers into thinking its advertisements were from the local utility, rather than from an ESCO.[17] The AVC required CleanChoice to cease its misleading advertising practices.[18]

84.    The complaint statistics for CleanChoice tell a similar story. The New York Office of Consumer Services ("OCS") monitors the number and types of complaints received against ESCOs operating in New York.[19] OCS divides the complaints into "initial complaints" and "escalated complaints." Initial complaints are all complaints first submitted to OCS. If those complaints are not addressed by the ESCO, they require further investigation by OCS and are categorized as escalated complaints. OCS has a record of the number of complaints for 82 ESCOs in 2022 and for 67 ESCOs in 2023. In 2022, CleanChoice had the second most initial

---

0808b.html.

[16] *Id.*

[17] Myles Snyder, *AG: Ethical Electric Misled Consumers*, ABC27 NEWS, https://www.abc27.com/news/ag-ethical-electric-misled-consumers/ (last updated June 11, 2015); *see also* N.H. Pub. Utils. Comm'n, No. DM 17-028, *CleanChoice Energy, Inc. Renewal Registration as a Competitive Electric Supplier*, ¶ 16 (Feb. 14, 2017), https://www.puc.nh.gov/regulatory/Docketbk/2017/17-028/INITIAL%20FILING%20-%20PETITION/17-028_2017-02-14_CCE_RENEWAL_REG_CEPS.PDF.

[18] *Id.*

[19] N.Y. Dep't Pub. Serv., Matter No. 19-00950, *Monthly Report December 2023* (Jan. 19, 2024), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search.

complaints brought against it out of all 82 ESCOs.[20]  In 2023, CleanChoice had the most initial complaints brought against it out of all 67 ESCOs.[21]  In 2022, CleanChoice had the second most escalated complaints[22] and tied for the most escalated complaints brought against it in 2023.[23] Comparing the number of complaints to OCS brought against all ESCOs in New York, CleanChoice had:  (i) over ***17 times*** the median number of initial complaints brought against it in 2022; (ii) over ***9 times*** the median number of initial complaints brought against it in 2023; (iii)  ***14 times*** the median number of escalated complaints brought against it in 2022; and (iv) ***8 times*** the median number of escalated complaints brought against it in 2023.[24]

## VIII.    The Abundant Proof That Deceptive Practices Like Those Employed By CleanChoice Have Massively Harmed Massachusetts Customers

85.    In restructuring the Massachusetts electricity market, the state legislature recognized that "electricity service is essential to the health and well-being of all residents of the commonwealth."  St. 1997, c. 164, § 1(a).  "Deregulation of the residential electric supply market promised to bring consumers in Massachusetts and other states a choice of electricity supply providers and lower bills."[25]

---

[20] *Id.* at 15–17.

[21] N.Y. Dep't Pub. Serv., Matter No. 19-00950, *Monthly Report May 2024* at 15–16 (June 27, 2024), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search

[22] N.Y. Dep't Pub. Serv., Matter No. 19-00950, *Monthly Report December 2023* at 18 (Jan. 19, 2024), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search.

[23] N.Y. Dep't Pub. Serv., Matter No. 19-00950, *Monthly Report May 2024* at 17 (June 27, 2024), https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search

[24] *See id.*

[25] Dec. 11, 2023, Letter from E. Markey, E. Warren, and A. Pressley to Lina M. Kahn, Chair of

86.    Yet as both of Massachusetts' two United States Senators and a Massachusetts Member of Congress recently noted, "consumers—disproportionately in low-income communities and communities of color—have endured unfair and deceptive marketing and sales tactics by competitive electric suppliers, saddling those consumers with higher electric bills and costing them hundreds of millions of dollars in net losses."[26]

87.    The Legislators' Letter cites the findings of the Massachusetts Attorney General's office that "in the last seven years, individual residential customers who received their electric supply from competitive suppliers paid $607 million more on their electric bills than they would have paid to their default utility."[27]    As the Attorney General testified to the state legislature, "these suppliers use deceptive marketing tactics that hide the fact that their products do not provide consumers with meaningful savings and in fact, can result in higher utility bills."[28] ESCOs' deceptive tactics also include, "failing to disclose industry consensus about price drops and that, if basic service prices decreased, consumers would pay higher prices under the competitive plan."[29]

---

the Federal Trade Commission ("Legislators' Letter") at 1 (Dec. 11, 2023), https://www.markey.senate.gov/imo/media/doc/letter_to_ftc_on_competitive_electric_suppliers_-_121123pdf.pdf.

[26] *Id.*

[27] *Id.* (citing Remarks of Attorney General Andrea Joy Campbell before the Joint Committee on Telecommunications, Utilities and Energy, Massachusetts House of Representatives (Sept. 21, 2023) ("MA A.G. Remarks"); *see also* Miriam Wasser, *Why a plan to drive down electric prices in Mass. Led to higher bills*, NPR (May 8, 2023), https://www.wbur.org/news/2023/05/08/massachusetts-eversource-national-grid-third-party-competitive-electricity.

[28] *Id.* (citing MA A.G. Remarks)

[29] *Id.* at 3.

88.    The Massachusetts Attorney General and the mayor of Boston have also recently noted that ESCOs in Massachusetts have employed "pervasive misleading marketing practices," and like CleanChoice here have made "false claims of clean, green energy." [30]  ESCOs like CleanChoice "have a track record of deploying aggressive, deceptive marketing tactics, making misleading promises about savings and clean energy, and enticing residents with lower initial rates that often skyrocket after a few months."[31]  "Third-party suppliers also routinely claim that the energy they sell helps Massachusetts achieve its clean energy goals" but "nothing could be further from the truth."[32]

89.    "Especially troublesome, the Attorney General's Office found that competitive electric suppliers have targeted vulnerable populations:

- low-income customers in Massachusetts are nearly twice as likely to sign up with individual competitive electric suppliers and are charged higher rates than non-low-income customers;

- assuming 600-kilowatt hour per month usage, typical for a Massachusetts household, an average non-low-income customer who signed up with a competitive supplier lost $222 per year while the average low-income customer lost $254 per year;

- low-income customers collectively experienced an annual net loss of more than $20 million due to higher rates and additional monthly fees;

- communities of color, communities with low median incomes, and communities with high percentages of residents lacking English proficiency correlate with higher rates of participation in the individual residential market for electric supply; and

---

[30] Campbell & Wu, n.1 *supra*.

[31] *Id.*

[32] *Id.*

- customers of advanced age who cannot understand the transaction or are particularly vulnerable are targeted and subjected to aggressive sales tactics."[33]

90.    In fact, "[f]orty percent of residents in Dorchester and Mattapan, two Boston neighborhoods with a high proportion of low-income residents, are enrolled with one of these suppliers."[34]  "Compared to the city's Community Choice Electricity program, residents have paid suppliers as much as $300 extra per month."[35]

91.    ESCOs' misleading practices are not isolated to Massachusetts.  An analysis by the *Wall Street Journal*, for example, found that "in nearly every state where they operate, retailers have charged more than regulated incumbents."[36]  Data from Massachusetts, Connecticut, Illinois, Maine, Maryland, New York, and Pennsylvania confirm that consumers pay far too much when they sign up with ESCOs instead of sticking with their utility companies.[37]

---

[33] Legislators' Letter at 2 (citing MA A.G. Remarks; Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to An Analysis of the Individual Residential Electric Supply Market in Massachusetts*, Massachusetts Attorney General's Office (May 2023), https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download, and *In re Liberty Power Holdings LLC*, Addendum to Proof of Claim Filed by the Commonwealth of Massachusetts, Case No. 21-13797-SMG (Bankr. S.D. Fla.)).

[34] Campbell & Wu, n.1 *supra*.

[35] *Id.*

[36] Scott Patterson & Tom McGinty, *Deregulation Aimed to Lower Home-Power Bills. For Many, It Didn't*, WALL ST. J. (Mar. 8, 2021), https://www.wsj.com/articles/electricity-deregulation-utility-retail-energy-bills-11615213623?page=16.

[37] Jenifer Bosco, *Retail 'choice': A bad deal for consumers and the planet*, UTILITY DIVE (Sept. 22, 2023), https://www.utilitydive.com/news/retail-choice-bad-deal-consumers-arrearages-renewable-energy-communitychoice/694355/.

92.     In New York (whose deregulated electricity market functions the same as the

Massachusetts market), the staff of New York's utility regulator (that "NYPSC") made the

following findings relevant here:

> [M]ass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.[38]
>
> * * *
>
> The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.   Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.
>
> Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers.   For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[39]
>
> * * *
>
> ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the

---

[38] CASE 12-M-0476, Dep't of Public Service Staff Unredacted Initial Brief, at 1, N.Y. Pub. Servs. Comm'n (Mar. 30, 2018).

[39] *Id.* at 41–42 (citations omitted).

ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[40]

93. As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied.[41] Likewise, when the ESCOs claimed that their provision to consumers of so-called value-added products, such as light bulbs and thermostats, contributed to their excessive rates, NYPSC staff found that "the cost incurred . . . in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[42]

94. Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best. ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[43]

95. Instead, NYPSC staff reached the following conclusion:

The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed

---

[40] *Id.* at 86 (citations omitted).

[41] *Id.* at 37.

[42] *Id.* at 87.

[43] *Id.* at 69.

by the ESCOs on unsuspecting residential and other mass market customers. These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market. These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[44]

96.    Thereafter, the NYPSC found that ESCOs' overcharging is completely unjustified and faulted ESCOs for concealing critical pricing data from both ordinary consumers ***and the NYPSC itself***: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[45]

97.    The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[46] and required that ESCO bills show how much the consumer's utility would have charged.[47]

98.    In addition, and in response to the mounting evidence of ESCOs' improper pricing practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.[48] The legislation was

---

[44] *Id.*

[45] CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 31, N.Y. Pub. Servs. Comm'n (Dec. 12, 2019), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}.

[46] *Id.* at 33.

[47] *Id.* at 33–34.

[48] Press Release, Governor Kathy Hochul, *Governor Hochul Signs Legislation to Protect*

introduced after reports that ESCOs in New York, like CleanChoice, charge some of the highest residential energy costs in the United States.[49]

99.     New York is not the only state using the overwhelming evidence of consumer harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices. Oregon's electric utility restructuring law allows for sales of alternative electric supply only to commercial and industrial customers, not to residential customers.  Connecticut has banned the sale of variable rate electricity, and on May 8, 2024, the Governor of Maryland signed a retail energy market reform bill that prohibits ESCOs from charging variable rates that "exceed the trailing 12–month average of the electric company's standard offer service rate in the electric company's service territory"[50]

100.    In an effort to protect electricity consumers, the Massachusetts Office of the Attorney General passed a number of regulations against deceptive rate setting when selling electricity.  *See generally* 940 C.M.R. § 19.04 ("It is an unfair or deceptive act or practice for a retail seller of electricity to make any material representation to the public or to any consumer, either directly or through any type of marketing or agreement, or through the use of any misleading symbol or representation, which the seller knows or should know has the capacity or tendency to deceive or mislead a reasonable consumer, or that has the effect of deceiving or misleading a reasonable consumer, in any material respect, including but not limited to representations relating to: (a) the quality, environmental . . . or source of any product or service

---

*Consumers from Surprise Price Increases in Energy Bills* (Sept. 20, 2023), https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills (last visited Nov. 2, 2023).

[49] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

[50] *Maryland Gov. Signs Retail Market Reform Bill*, ENERGY CHOICE MATTERS, http://www.energychoicematters.com/stories/20240507z.html (last visited July 15, 2024).

being offered for sale by any retailer of electricity . . . . (d) any term of any agreement to be entered into by the retail seller of electricity and a consumer.  (e) the distribution price, the generation price or the total delivered price of electricity or the price of any related electricity products or service to be charged to a consumer.").

101.    These regulations have unfortunately not prevented widespread overcharges by ESCOs like CleanChoice.  "Regulation has not succeeded in changing the behavior of the industry" because "[m]any, if not most, third-party suppliers continue to aggressively resist transparency reforms and attempts by regulators to hold them accountable."[51] "Indeed, despite legal actions brought by the [Massachusetts Attorney General] against certain competitive suppliers and their marketers for deceptive marketing practices and increased regulatory scrutiny on individual residential suppliers in Massachusetts and elsewhere, the overall consumer loss continues unabated."[52]  ESCOs "collectively refuse to acknowledge the problems" and "actively oppose attempts to make meaningful revisions to their underlying business practices that would help to transform this market into one that provides net benefits instead of net harm."[53]

102.    At present, Massachusetts policymakers are pursuing two additional measures. First, in April 2024, in a 34-4 vote the Massachusetts Senate approved Senate Bill No. 2738, which would ban ESCOs from serving Massachusetts residential customers as of January 1,

---

[51] Campbell & Wu, n.1 *supra*.

[52] Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to An Analysis of the Individual Residential Electric Supply Market in Massachusetts*, MASSACHUSETTS ATTORNEY GENERAL'S OFFICE, at 33 (May 2023), https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download.

[53] *Id.* at 33–34.

2025.[54]  Second, policymakers are calling for enforcement litigation.  For example, in December

2023 both of Massachusetts' United States Senators and a Massachusetts Member of Congress

urged the Federal Trade Commission to begin enforcement actions against ESCOs because state

regulatory enforcement activity has proven "difficult for state officials," and after ten years of

pursuing ESCOs the Massachusetts Attorney General's office "has recovered only $19 million—

a small fraction of the more than $600 million lost" by Massachusetts customers.[55]

## **CLASS ACTION ALLEGATIONS**

103.    Plaintiff brings this action on his own behalf and additionally, pursuant to

Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all

CleanChoice customers in Massachusetts from the earliest allowable date through the date of

judgment (the "Class").

104.    As alleged throughout this Complaint, the Class claims all derive directly from a

single course of conduct by Defendant.  Defendant has engaged in uniform and standardized

conduct toward the Class—its marketing and billing practices—and this case is about the

responsibility of Defendant for its knowledge and conduct in deceiving and mistreating its

customers.  This conduct did not meaningfully differentiate among individual Class Members in

its degree of care or candor, its actions or inactions, or in its misrepresentations or omissions.

Upon information and belief, the variable rate provisions in the customer agreements for all of

CleanChoice's Massachusetts customers (the "Class Members") are materially the same.

---

[54] *Mass. Senate Advances Bill That Would Eliminate Retail Electricity Market*, S&P GLOBAL
(April 26, 2024), https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-
headlines/mass-senate-advances-bill-that-would-eliminate-retail-electricity-market-81374336
[55] Legislators' Letter at 3 (citing Chris Lisinski, State House News Service, *Mass. leaders eye
changes to 'predatory' electric sales tactics*, WBUR (June 6, 2023),
https://www.wbur.org/news/2023/06/06/mass-leaders-eye-changes-to-predatory-electric-sales-
tactics).

105.    Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

106.    Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiff files his motion for class certification.

107.    Plaintiff does not know the exact size of the Class since such information is in the exclusive control of CleanChoice.  Plaintiff believes, however, that based on the publicly available data concerning Defendant's customers in the United States, the Class encompasses at least thousands of individuals whose identities can be readily ascertained from Defendant's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

108.    The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

109.    Plaintiff is also an adequate class representative.  His claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by the Defendant.  Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

110.    Plaintiff fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent their interests and those of the Class.

111.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.  Whether Defendant's misrepresentations and omissions are materially misleading;

      b.  Whether Defendant breached its contract with Plaintiff and Class Members by failing to set variable rates in the method dictated by the parties' contract;

      c.  Whether Defendant's conduct violates Mass. Ge. Laws Ch. 93A;

      d.  Whether Defendant was unjustly enriched as a result of its conduct;

      e.  Whether Defendant violated the duty of good faith and fair dealing in its consumer contracts;

      f.  Whether Class Members have been injured by Defendant's conduct;

      g.  Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

      h.  The extent of class-wide injury and the measure of damages for those injuries.

112.    A class action is necessary because i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

113.    A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

114.    A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

115.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a) and 23(b).

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (On Behalf Of The Class)

116.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

117.    CleanChoice customers have customer contracts with Defendant whose variable rate pricing terms are identical or substantially similar.

118.    Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity.

119.    CleanChoice uniformly represents to its Massachusetts customers that its variable rates for electricity will be calculated based on "market conditions" and "CleanChoice Energy's costs to provide energy supply service."

120.    This contractual formula does not afford CleanChoice any rate-setting discretion whatsoever.

121.    Upon information and belief, Plaintiff was subject to the same or substantially similar contractual terms for his variable rate for electricity as CleanChoice's other customers in Massachusetts.

122.    Pursuant to the contracts, Plaintiff and the Class paid the variable rates Defendant charged for electricity.

123.    However, Defendant failed to perform its obligations under its contracts to charge rates based on "market conditions" and "CleanChoice Energy's costs to provide energy supply service." Instead, Defendant charged variable rates for electricity that were not "based on" these two factors.

124.    Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant charged the rate required by its customer contract.

125.    Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

126.    Under the contract, to the extent Defendant had discretion to set the variable rate for electricity, it was obligated to exercise its discretion in good faith. Defendant exercised its discretion in bad faith. Specifically, Defendant acted with a bad motive and continued to gouge customers. Defendant has known for years (i) that it's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, even when accounting for the minimal costs of additional RECs (ii) that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, other than the minimal cost of additional RECs (iii) that

Defendant could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, (iv) that Defendant could, but failed to, disclose the true methodology it used to calculate its variable rates, and (v) that Defendant could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged. Despite this superior knowledge, Defendant acted with a bad motive and continued to gouge consumers and small businesses.

127.    Defendant's failure to disclose the material information outlined in the prior paragraph is what permitted CleanChoice to charge Plaintiff whatever it wanted—unburdened by disclosing the truth about its rate setting practices—and Plaintiff experienced the adverse consequences in the performance of the parties' agreement.

128.    Plaintiff reasonably expected that CleanChoice's variable energy rates would not be continuously and significantly higher than the utility's rates, which provide the same energy supply as CleanChoice. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy electricity from Defendant.

129.    Plaintiff also reasonably expected that Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy electricity from Defendant. Defendant knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

130.    Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiff's and other Class Members' reasonable expectations.

131.     By reason of the foregoing, Defendant is liable to Plaintiff and other Class

Members for the damages that they have suffered as a result of Defendant's actions, the amount

of such damages to be determined at trial, plus attorneys' fees.

132.     As a result of Defendant's breaches, CleanChoice is liable to Plaintiff and members

of the Class for damages and attorney's fees and expenses.

**COUNT II**
**VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS.**
**GEN. LAWS CH. 93A, §§1, ET SEQ.**
**(On Behalf Of The Class)**

133.     Plaintiff realleges and incorporates by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

134.     Plaintiff brings this claim under MASS. GEN. LAWS ch. 93A, §2 on his own

behalf and on behalf of each member of the class.

135.     Massachusetts' consumer protection statute prohibits "deceptive acts or practices

in the conduct of any trade or commerce."  MASS. GEN. LAWS ch. 93A, §2.

136.     Because it engages in the "sale of a commodity for future delivery," Defendant is

engaged in "commerce" under the definition established in MASS. GEN. LAWS. ch. 93A, §1.

137.     Defendant has engaged in, and continues to engage in, unfair methods of

competition and unfair or deceptive acts or practices in violation of MASS. GEN. LAWS ch.

93A, §2,  including:

      a.   Misrepresenting in its form customer contract the basis upon which its
           variable rates are set;

      b.   Misrepresenting in its form customer contract that customers' future
           monthly prices "may" be higher than the introductory price because its
           subsequent rates are always higher than the introductory rates;

c.  Misrepresenting in its marketing materials that by signing up with CleanChoice, customers would "obtain your electricity from renewable sources provided by CleanChoice Energy;"

d.  Misrepresenting in its marketing materials CleanChoice provides "100% renewable energy."

e.  Misrepresenting in its form customer contract that that the energy it provides "include[s] 100% renewable energy resources."

f.  Misrepresenting in its marketing materials that "CleanChoice Energy will source wind and solar power from farms in your region" to supply customers with electricity;

g.  Misrepresenting in its marketing materials that "[r]enewable energy is produced from wind and solar sources" and "[u]like conventional electricity sources, renewable sources do not produce carbon dioxide or contribute to air pollution," when in fact CleanChoice supplied the same brown energy as the utility;

h.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

i.  Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, other than the minimal cost of additional RECs;

j.  Failing to adequately disclose the true methodology Defendant used to calculate its rates;

k.  Failing to provide customers adequate advance notice of the variable rates it would charge; and

l.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

138.    The above deceptive practices and acts by CleanChoice were material omissions of existing or past facts and affirmative misrepresentations.

139.    Mass. Ann. Laws ch. 93A, § 2(c) provides that "[t]he attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter," which in turn

provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

140.    The Attorney General has issued such rules and regulations with respect to protecting consumers from retail electricity suppliers like CleanChoice.

141.    940 C.M.R. § 19.00 is titled "Retail Marketing And Sale Of Electricity." Section 19.04 provides in relevant part that: "It is an unfair or deceptive act or practice for a retail seller of electricity to make any material representation to the public or to any consumer, either directly or through any type of marketing or agreement, or through the use of any misleading symbol or representation, which the seller knows or should know has the capacity or tendency to deceive or mislead a reasonable consumer, or that has the effect of deceiving or misleading a reasonable consumer, in any material respect, including but not limited to representations relating to:

> (a) the quality, environmental or other characteristics, or source of any product or service being offered for sale by any retail seller of electricity . . . .
>
> (d) any term of any agreement to be entered into by the retail seller of electricity and a consumer.
>
> (e) the distribution price, the generation price or the total delivered price of electricity or the price of any related electricity products or service to be charged to a consumer."

142.    CleanChoice violates these provisions by misrepresenting the environmental characteristics and source of its electricity, and misrepresenting that it will charge a rate based on "market conditions" and "CleanChoice Energy's costs to provide energy supply service."

143.    Each of Defendant's contracts include a three-day rescissionary period. During the rescissionary period, Defendant's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period. Thus, the contract is an advertisement in which Defendant misrepresents that the

variable energy rates will be based upon the two factors identified in the contract.  Defendant knew or believed that the above unfair and deceptive practices and acts were material omissions.

144.    The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of Massachusetts, which aims to protect consumers.

145.    Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase electricity from CleanChoice.

146.    Defendant knew at the time it signed up Plaintiff and prospective customers that the price of a customer's energy supply was a material factor in choosing CleanChoice.

147.    Defendant knew at the time it signed up Plaintiff and prospective customers that a customer's primary alternative to CleanChoice was the customer's local utility.

148.    Defendant knew at the time it signed up Plaintiff and prospective customers that CleanChoice's variable rates for electricity were consistently substantially higher than Plaintiff and prospective customer's local utility rate, a rate based on market conditions and the utility's costs to provide energy supply service.

149.    Defendant's omissions and misrepresentations about CleanChoice's variable rates for electricity were material to prospective customers.

150.    Defendant's intentional concealments were designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with the costs and factors specified in the contract.  By concealing its actual pricing strategy (artificially inflating prices and maximizing profits), Defendant deprived consumers from being able to make informed purchasing decisions.

151.    Defendant's practices are unfair, unconscionable and outside the norm of reasonable business practices.

152.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and Class Members remained with CleanChoice and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on based on "market conditions" and "CleanChoice Energy's costs to provide energy supply service," as well as the difference in CleanChoice's variable rate and the default rate utilities charge, which is the rate Plaintiff and Class Members would have received had the not been deceived into accepting electricity supply from Defendant, and because they were not provided 100% renewable energy which is much more valuable than the brown electricity CleanChoice supplied.  By reason of the foregoing, Defendant is liable to Plaintiff and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

153.    Plaintiff and the members of the Class further seek equitable relief against Defendant.  Pursuant to MASS. GEN. LAWS ch. 93A, §11, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiff and the Class all amounts wrongfully assessed and/or collected.

154.    As a result of Defendant's deceptive acts or practices, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under MASS. GEN. LAWS ch. 93A, §2.

155.     Pursuant to Massachusetts General Law ch. 93(A), §9(3), on May 30, 2024 Plaintiff served Defendant's counsel with a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf Of The Class)**

156.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

157.     This cause of action is pleaded in the alternative to Plaintiff's contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiff does not intend to proceed with their unjust enrichment claim.

158.     Plaintiff and the Class Members conferred a tangible economic benefit upon Defendant by contracting with Defendant for electricity.  Plaintiff and the Class would not have contracted with Defendant for electricity had they known that Defendant would abuse the information asymmetry between it and its customers to charge excessive and exploitative rates.

159.     Plaintiff and the Class Members would not have purchased energy from Defendant had they known the truth about Defendant's variable energy rates and the source of Defendant's electricity.

160.     By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiff and Class Members.

161.     It would be unjust and inequitable for Defendant to retain the payments Plaintiff and Class Members made for excessive energy charges.

162.    Therefore, Defendant is liable to Plaintiff and Class Members for the damages that they have suffered as a result of Defendant's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)    Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Defendant CleanChoice has committed the violations of law alleged herein;

(c)    Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(e)    Render an award of punitive and treble damages;

(f)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)    Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine any issue triable of right.

Dated:  July 18, 2024
New York, New York

By:    /s/D. Greg Blankinship
       D. Greg Blankinship BBO # 655430
       FINKELSTEIN, BLANKINSHIP,
       FREI-PEARSON & GARBER, LLP
       One North Broadway, Suite 900
       White Plains, New York 10601
       Telephone: (914) 298-3281
       gblankinship@fbfglaw.com

J. Burkett McInturff*
**WITTELS MCINTURFF PALIKOVIC**
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (910) 476-7253
jbm@wittelslaw.com

*Attorneys for Plaintiff and the Proposed Class*

*\* Motion for pro hac vice admission forthcoming*