**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MARK SOMMER**, on behalf of himself and all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>**CLEANCHOICE ENERGY, INC.**,<br><br>　　　　　Defendant. | Civil Case No. 24-CV-11844-NMG |

<u>**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**</u>

John A. Shope
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210
Telephone: (617) 832-1233
Facsimile: (617) 832-7000
jshope@foleyhoag.com

Michael D. Matthews, Jr.*
Diane S. Wizig*
Renee T. Wilkerson*
Louise R. Grable*
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
renee.wilkerson@mhllp.com
louise.grable@mhllp.com

*Attorneys for Defendant CleanChoice
Energy, Inc.*

*Admitted *pro hac vice*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND...................................................................... 2

    A.     The deregulated electricity market in Massachusetts. .................................................. 2

    B.     Mr. Sommer signs up for electricity supply with CleanChoice................................... 3

ARGUMENT ............................................................................................................................... 6

    A.     Rule 12(b)(6) Standard of Review. ............................................................................. 6

    B.     Mr. Sommer alleges no cognizable claims against CleanChoice. ............................... 7

        1.     Mr. Sommer's causes of action premised on impermissible pricing fail as a matter of law. ....................................................................................................................... 7

            a.     The Sommer Materials' plain language fatally undermines the pricing claims. ...................................................................................................... 7

            b.     Mr. Sommer's comparators are all irrelevant and invalid. ............................ 10

        2.     Mr. Sommer's pricing claims each fail for independent reasons too. .................. 14

            a.     Breach of Contract: No factual allegations of breach of the implied covenant. .............................................................................................. 14

            b.     Unjust Enrichment: Fails on multiple grounds. ............................................ 15

        3.     Mr. Sommer's Chapter 93A claim fails as a matter of law and is time-barred. ... 16

            a.     Chapter 93A claim fails because CleanChoice's statements were not deceptive. .............................................................................................. 16

            b.     Mr. Sommer's Chapter 93A claim is barred by the statute of limitations. ...... 18

CONCLUSION............................................................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. White Winston Select Asset Funds, LLC*,
  648 F. Supp. 3d 230 (D. Mass. 2022) ....................................................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................................................6, 19

*Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*,
  228 F.3d. 24 (1st Cir. 2000) ....................................................................................................3

*Cost v. FCA US LLC*,
  542 F. Supp. 3d 83 (D. Mass. 2021) .....................................................................................20

*Crissen v. Gupta*,
  994 F. Supp. 2d 937 (S.D. Ind. 2014) .....................................................................................7

*Edlow v. RBW, LLC*,
  688 F.3d 26 (1st Cir. 2012) ...................................................................................................15

*Erban v. Tufts Med. Ctr. Physicians Org., Inc.*,
  652 F. Supp. 3d 149 (D. Mass. 2023) ......................................................................................3

*Hamlen v. Gateway Energy Servs. Corp.*,
  No. 16 CV 3526, 2017 WL 892399 (S.D.N.Y. Mar. 6, 2017) ...............................................10

*LaChapelle v. Berkshire Life Ins. Co.*,
  142 F.3d 507 (1st Cir. 1998) .................................................................................................20

*LoCicero v. Leslie*,
  948 F. Supp. 10 (D. Mass. 1996) .............................................................................................4

*Martinez v. Agway Energy Services, LLC*,
  88 F.4th 401 (2d Cir. 2023) .......................................................................................7, 8, 9, 11

*McAdams v. Massachusetts Mut. Life Ins. Co.*,
  391 F.3d 289 (1st Cir. 2004) .................................................................................................10

*Mirkin v. XOOM Energy, LLC*,
  931 F.3d 173 (2d Cir. 2019) ..................................................................................................12

*Mirkin v. XOOM Energy, LLC*,
    No. 18-CV-2949, 2023 WL 5200294 (E.D.N.Y. Aug. 14, 2023) ......................................9, 10

*Nieves v. Just Energy New York Corp.*,
    No. 17-CV-561S, 2020 WL 6803056 (W.D.N.Y. Nov. 19, 2020) ..........................................10

*O'Brien v. Deutsche Bank Nat'l Trust Co.*,
    948 F.3d 31 (1st Cir. 2020)................................................................................................18, 19

*Platten v. HG Bermuda Exempted Ltd.*,
    437 F.3d 118 (1st Cir. 2006)..................................................................................................16

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
    366 Mass. 593 (1975) ............................................................................................................17

*Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am. LLC*,
    794 F.3d 200 (1st Cir. 2015)..................................................................................................19

*Rafferty v. Merck & Co.*,
    479 Mass. 141 (2018) ............................................................................................................17

*Richards v. Direct Energy Servs., LLC*,
    915 F.3d 88 (2d Cir. 2019)........................................................................................8, 11, 13

*Ruiz v. Bally Total Fitness Holding Corp.*,
    447 F. Supp. 2d 23 (D. Mass. 2006), *aff'd*, 496 F.3d 1 (1st Cir. 2007)..................................16

*Salls v. Digital Fed. Credit Union*,
    349 F. Supp. 3d 81 (D. Mass. 2018) ......................................................................................16

*Sevugan v. Direct Energy Servs., LLC*,
    931 F.3d 610 (7th Cir. 2019) ................................................................................................11

*Sevugan v. Direct Energy Servs., LLC*,
    No. 17 C 6569, 2018 WL 4126568 (N.D. Ill. Aug. 29, 2018)..................................................12

*SiOnyx, LLC v. Hamamatsu Photonics K.K.*,
    332 F. Supp. 3d 446 (D. Mass. 2018) ....................................................................................16

*Speleos v. BAC Home Loans Servicing, L.P.*,
    755 F. Supp. 2d 304 (D. Mass. 2010) ....................................................................................15

*T.W. Nickerson, Inc. v. Fleet Nat'l Bank*,
    456 Mass. 562, 924 N.E.2d 696 (2010) ................................................................................15

*Verrier v. Beth Israel Deaconess Hospital-Plymouth, Inc.*,
    706 F. Supp. 3d 142 (D. Mass. 2023) ....................................................................................19

*Verzani v. Costco Wholesale Corp.*,
    No. 09 Civ. 2117, 2010 WL 3911499 (S.D.N.Y. Sept. 28, 2010) ...........................................18

*Weinberg v. CleanChoice Energy, Inc.*,
    No. 23-CV-09685, 2024 WL 3446515 (S.D.N.Y. July 17, 2024) ..........................9, 10, 18, 21

*Woods v. Wells Fargo Bank, N.A.*,
    733 F.3d 349 (1st Cir. 2013) ...............................................................................................17

*Zielinski v. Citizens Bank, N.A.*,
    552 F. Supp. 3d 60 (D. Mass. 2021) ....................................................................................17

**Statutes**

Mass. Gen. Laws ch. 260, § 5A ...............................................................................................18

Massachusetts Consumer Protection Act Chapter 93A ......................................................... *passim*

U.C.C. § 2-723(1) (Am. Law Inst. & Unif. Law Comm'n 2017).....................................................8

Wright & Miller, Federal Practice and Procedure § 1363 (3d ed. 1998).........................................4

**Other Authorities**

16 C.F.R. § 260.15(a)..............................................................................................................18

Fed. R. of Civ. P. 9(b)..............................................................................................................20

Fed. R. of Civ. P. 12(b)(6) ...................................................................................................6, 20

Fed. R. of Civ. P. 12(b)(1) .......................................................................................................20

**INTRODUCTION**

This case is about the renewable electricity that defendant CleanChoice Energy, Inc. sold to plaintiff Mark Sommer and the variable rates he agreed to pay for it. Mr. Sommer claims that CleanChoice's contract materials misrepresented how it would set his rates and misled him about the renewable attributes of his electricity. His breach of contract and deception allegations, however, are incorrectly patterned on those in a lawsuit involving New York plaintiffs who received contracts with different language.[1] They do not support a claim here. Mr. Sommer amended in response to CleanChoice's motion to dismiss his Original Complaint. But the factual allegations in the Amended Complaint are still deficient and do not state a claim when measured against the plain language of his contract materials.

With respect to pricing claims, Mr. Sommer's contract gave CleanChoice discretion to set rates based on a long list of factors that was "not exhaustive" and included the company's margins. It also disclaimed savings and disclosed that "[y]our variable rate may be higher than your utility rate or other suppliers' rates," and "renewable energy costs more." Variable-rate caselaw holds that allegations like Mr. Sommer's do not state a claim when a supplier has similar rate-setting discretion and does not promise savings over or a correlation to the utility or retail competitors.

As to renewable energy claims, the Amended Complaint's allegations of deception are directly contradicted by CleanChoice's contract materials themselves, which show that CleanChoice explained the electricity it sells is "the product of a mix of generation energy sources … [not] from a specific generation facility delivered directly to your service address" but is matched in quantity with renewable energy "by purchasing and retiring 'renewable energy

---

[1] Mr. Sommer's counsel filed Civil Action No. 7:23-cv-09685 on behalf of Eric Weinberg and Robert and Joanne Sudakow in the Southern District of New York on November 2, 2023. Mr. Weinberg's claims have since been compelled to arbitration and denial of the motion to compel the Sudakows' claims to arbitration is on appeal.

certificates' (RECs) representing the environmental attributes associated with the applicable amount of renewable energy generation." That is the only way to sell retail renewable electricity and the Federal Trade Commission recommends such disclosure language in its "Green Guides."

Moreover, the representations about rates and renewables that Mr. Sommer says were false or misleading came nearly five years before he filed suit. So, his claim for violations of Chapter 93A of the Massachusetts Consumer Protection Act is also barred by the statute of limitations.

In sum, Mr. Sommer was never misled. CleanChoice told him its electricity was renewable because it was paired with RECs, that it "costs more," that grid power comes from a mix of sources, and that his rates would be set at CleanChoice's discretion based on non-exclusive factors including its margins. And if Mr. Sommer did not like the rates charged and listed on any of his forty-three months of bills, his contract allowed him to cancel at any time without any fee. He did not do so. Instead, he now asks the Court to retroactively regulate the competitive market and rates that the Massachusetts Legislature deregulated. The Court should instead dismiss his claims.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The deregulated electricity market in Massachusetts.

Massachusetts deregulated its retail electricity market in 1997, giving end-users the option to buy electricity supply from the utility or any licensed "ESCO" (energy services company)— with the utility keeping a monopoly to charge for delivering the commodity. *See* Am. Compl. ¶¶ 24–25. Unlike the regulated utility, ESCOs like CleanChoice are not required to seek approval for the rates they charge or the methods by which they set them. *Id*. ¶ 26. Consumers now account for their own needs and preferences and decide whether an ESCO's product is a good fit. And if consumers think a better product is available, they can switch suppliers.

Electricity is delivered to Massachusetts consumers across a single grid operated by ISO-New England, the regional independent system operator. As this table in Mr. Sommer's contract shows, the grid is a mix of power from many different generation sources. And because the grid is a mix, as the EPA explains, "RECs are the instrument that electricity consumers must use to substantiate renewable electricity use claims"—and "the accepted legal instrument through which renewable energy generation and use claims are substantiated in the U.S. renewable electricity market."[2]

| Electricity Source | CleanChoice Energy | ISO NE Fuel Mix |
|---|---|---|
| Coal | 0% | 1.07% |
| Gas | 0% | 48.71% |
| Nuclear | 0% | 30.26% |
| Oil | 0% | 1.12% |
| Refuse | 0% | 2.91% |
| Renewable Energy: | | |
| Wind | 99% | 3.25% |
| Methane | 0% | 0.04% |
| Solar | 1% | 1.17% |
| Hydro | 0% | 8.40% |
| Landfill Gas | 0% | 0.43% |
| Wood/Biomass | 0% | 2.64% |

*NE ISO System Fuel Mix 2016*

## B.   Mr. Sommer signs up for electricity supply with CleanChoice.

In 2019, Mr. Sommer entered into a renewable electricity contract with CleanChoice for three months of fixed rates at $0.191 per kWh followed by monthly variable pricing. *See* Ex. 1, July Mailer; Ex. 2, July Enrollment Form; Ex. 3, July Contract.[3] Before the fixed-rate term expired, CleanChoice mailed him an offer for three more months of fixed rates at $0.15 per kWh followed by monthly variable pricing. Am. Compl. ¶¶ 31–32; Ex. 4, Sept. Mailer (the "Mailer"); Ex. 5, Sept. Enrollment Form; Ex. 6, Sept. Contract (the "September Contract"). Mr. Sommer accepted that offer and the variable rates charged under the September Contract are what he challenges here.

---

[2] https://www.epa.gov/green-power-markets/renewable-energy-certificates-recs#one (last visited November 5, 2024). RECs are the renewable attribute of electricity: "a market-based instrument that represents the property rights to the environmental, social, and other non-power attributes of renewable electricity generation." *Id.*

[3] Mr. Sommer's contract materials that form the basis of his Amended Complaint and are repeatedly referenced in it are attached here as Exhibits 1–6. The Court can consider them under the incorporation-by-reference rule. *Erban v. Tufts Med. Ctr. Physicians Org., Inc.*, 652 F. Supp. 3d 149, 156 (D. Mass. 2023) (courts consider "documents central to plaintiffs' claim, and documents sufficiently referred to in the complaint."); *see also Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*, 228 F.3d. 24, 32 (1st Cir. 2000) (courts "consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint"). Mr. Sommer's claims are premised on his contract materials, so they are "integral" and "central" to his claims. *See* Am. Compl. ¶¶ 32–41, 55, 71–72, 88–89, 144–158, 163, 185–87. Because he enrolled in the September contract before his July contract's fixed term expired, he was never charged variable rates under the July contract and therefore cannot have a claim that it was breached or that its materials misled him into paying variable rates. But regardless, besides the initial fixed rates ($0.191 versus $0.15), the terms and disclosures in the July and September contract materials are identical. So any claim under the July materials would fail for the same reasons claims under the September materials fail.

3

The September 2019 Mailer included a disclosure summarizing the terms of the proposed agreement, an FAQ sheet, and an enrollment authorization form. *See generally* Ex. 4. It also contained terms that disprove Mr. Sommer's allegations that CleanChoice misled him about the nature of renewable electricity, its variable rate setting, and how those rates compare to rates charged by the utility or other ESCOs:[4]

| Amended Complaint's Allegations | CleanChoice's Disclosures |
| --- | --- |
| **Rate Setting:** "[A]ny reasonable customer, including Plaintiff, would reasonably expect that CleanChoice's variable rates would be 'based on' CleanChoice's costs and would reflect CleanChoice's actual costs plus a reasonable fixed margin, meaning that CleanChoice's rates must "be determined solely by CleanChoice's 'costs'." Am. Compl. ¶ 38–39. | CleanChoice stated that its variable rate "may vary each month and is ***based on a number of costs*** which may include, but are ***not limited to***: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, ***plus CleanChoice Energy operating costs, expenses, and margins***. This list of factors is ***not exhaustive*** and no single factor will determine the rate." Ex. 4, at 3 (emphasis added). |
| **Renewables:** "Rather than producing renewable electricity … CleanChoice simply purchases wholesale electricity from the same market used by customers' utilities and buys additional renewable energy credits that represent the production by another entity of wind and solar energy in the form of RECs … CleanChoice then deceptively markets its electricity as coming from renewable sources and justifies its price gouging for this 'brown' electricity by repackaging it as energy from renewable sources." Am. Compl. ¶ 41. | CleanChoice disclosed that "[e]lectricity is the product of a mix of energy sources that is delivered over a system of wires. ***You will not have electricity from a specific generation facility delivered directly to your service address***, but CleanChoice Energy ensures that your electricity usage is offset by the generation of energy from renewable energy sources on an annual basis. ***The energy your home uses will be paired with renewable energy sources through the purchase of Renewable Energy Certificates***." Ex. 4, at 3 (emphasis added). |
| **Renewables:** CleanChoice falsely states that it "will source wind and solar power from farms in your region," while "the actual energy supplied to CleanChoice customers' meters is the | CleanChoice disclosed in the Mailer's FAQs: "CleanChoice Energy will source wind and solar power from farms in your region. ***For customers in Massachusetts, CleanChoice Energy procures renewable energy certificates from the following*** |

---

[4] The Court is not required to accept allegations that are controverted by documents referenced in the Amended Complaint and properly attached to this motion. *See LoCicero v. Leslie*, 948 F. Supp. 10, 12 (D. Mass. 1996) (transcript from state court action "clearly" contradicted plaintiff's claim and "[i]f th[e] Court were to ignore the transcript, it would diminish the value and significance of the prior judicial proceedings"); Wright & Miller, Federal Practice and Procedure § 1363 (3d ed. 1998) (collecting cases) ("The district court will not accept as true pleading allegations that are contradicted by … other allegations or exhibits attached to or incorporated in the pleading.").

4

| | |
|---|---|
| same 'brown' energy the customer would get if supplied by the utility." Am. Compl. ¶ 91. | *states: MA, NY, NH, ME, RI, PA and VT*." Ex. 4, at 2 (emphasis added). |
| **Utility Rates:** CleanChoice's costs "should correlate with the utility's costs and over time should be roughly similar." Am. Compl. ¶ 48. | CleanChoice disclosed that "*your variable rate may not correlate with* changes in wholesale market prices or *your utility's rates*. *Your variable rate may be higher than your utility rate* or other suppliers' rates," that "supporting new *renewable energy costs more*," and that there were "no guarantee[d] savings with this plan." Ex. 4, at 2–3 (emphasis added). |

Mr. Sommer, having received these disclosures, signed the Mailer's enrollment form under an affirmation of its terms: "I have reviewed and accept the enclosed terms and conditions." *See* Ex. 5; Am. Compl. ¶¶ 32–33, 36. As a result, and as also disclosed, CleanChoice then sent him a welcome package that included the rest of his contract terms and conditions. *See* Am. Compl. ¶ 33; Ex. 6; *see* Ex. 4, at 3 ("If you choose to enroll, you will receive full terms and conditions further explaining the details of your plan."). The September Contract stated that it, along with the Mailer and enrollment form (collectively the "Sommer Materials"), constituted Mr. Sommer's agreement with CleanChoice. *See* Ex. 6, at 2 and 4.

The September Contract also reiterated the terms and disclosures in the Mailer that contradict Mr. Sommer's allegations. For example, it disclaimed savings versus the utility and disclosed that the variable price may increase, "possibly significantly." Ex. 6, at 1. And in multiple places, including this disclosure immediately below the "Product Summary" first section of the terms, it again explained that the green attributes of electricity come from RECs while the electricity delivered by the grid comes from a mix of brown and green generation sources:

> Typical grid power in your region is produced primarily from fossil fuels like coal, natural gas, and oil. CleanChoice Energy, matches 100% of your electricity usage with the purchase of renewable energy credits from sources, averaged annually, with no carbon emissions or harmful pollutants.

Ex. 6, at 2 (also providing a table showing the "region's fuel mix" of 8.75% renewable and 91.25%

non-renewable on the grid); *see* Ex. 6, at 2–3 ("You will not have electricity from a specific generation facility delivered directly to your service address … [but will have] (RECs) representing the environmental attributes" of 100% renewable energy generation).

In addition, like the Mailer, the September Contract allowed Mr. Sommer to rescind the agreement up to three days after receipt without charge or penalty, and to cancel it at any time without any cancellation or early termination fee. Ex. 6, at 3 ("$0 Cancellation Fee"). Mr. Sommer instead chose to continue his service and continued to pay variable rates for the next three and a half years, until March 2023. *See* Am. Compl. ¶ 18.

On July 18, 2024—five years after he first enrolled with CleanChoice—Mr. Sommer filed this class action lawsuit, asserting claims for (1) breach of contract, including breach of the implied covenant of good faith and fair dealing, (2) unjust enrichment, and (3) violations of the Massachusetts Consumer Protection Act. ECF No. 1. CleanChoice timely moved to dismiss. ECF No. 11. Mr. Sommer amended on October 11, 2024, ECF No. 22, asserting the same causes of action, and CleanChoice now seeks dismissal of the Amended Complaint in full with prejudice.

## ARGUMENT

### A.      Rule 12(b)(6) Standard of Review.

Rule 12(b)(6) requires a complaint to contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Facial plausibility requires factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

Because no class has been certified, the court should "look[] only to … [the named

plaintiffs'] individual claims and the circumstances [they] allege[] relating to [their individual situations] … and not to allegations surrounding the … [situations of other] putative class members." *Crissen v. Gupta*, 994 F. Supp. 2d 937, 945–46 (S.D. Ind. 2014) (collecting cases).

**B.      Mr. Sommer alleges no cognizable claims against CleanChoice.**

   1.   <u>Mr. Sommer's causes of action premised on impermissible pricing fail as a matter of law.</u>

       a.       *The Sommer Materials' plain language fatally undermines the pricing claims.*

Mr. Sommer's pricing claims center on the allegation that "CleanChoice did not provide its customer with prices 'based on' the 'costs' included in its contract, but rather used a methodology that focused on maximizing profits." Am. Compl. ¶ 4. Mr. Sommer contends that CleanChoice could base its rates "solely" on its costs, and that because it allegedly did not do so, it breached its contractual obligation. *Id.* ¶¶ 39–40, 150. But the Sommer Materials, along with a well-developed body of case law addressing variable-rate contracts, foreclose that claim.

The Sommer Materials gave CleanChoice discretion to use many factors beyond its costs to set its rates:

> A variable supply rate may vary each month and is based on a number of costs *which may include, but are not limited to:* energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees *and other factors, plus CleanChoice Energy operating costs, expenses, and margins.* This list of factors is *not exhaustive and no single factor will determine the rate*.

Ex. 4, at 3 (emphasis added). The Sommer Materials also state that rates "may vary monthly depending on market conditions" and that "the price … may increase, or decrease, possibly significantly." Ex. 6, at 1, 3. On its face, such language does not promise rates based *solely* on costs. Rather, as demonstrated by variable-rate caselaw, it forecloses Mr. Sommer's claims that CleanChoice breached by basing rates on factors other than costs.

The First Circuit has not interpreted pricing language in variable-rate energy contracts. But the Second Circuit has done so several times. Its rulings are instructive. For example, in *Martinez*

7

*v. Agway Energy Services, LLC*, the Second Circuit examined language like CleanChoice's:

> The Electric Variable Rate shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges ***and other market-related factors***, plus all applicable taxes, fees, charges or other assessments ***and Agway's costs, expenses and margins.***

88 F.4th 401, 407–08 (2d Cir. 2023) (emphasis added). And although the Agway contract referenced costs, the Second Circuit found it did not promise the variable rate would be based on ***only*** those costs. *Id.* at 412. Rather, as with the Sommer Materials, the "costs were only one among several named factors, including unspecified 'market-related factors' that the Agreement gave Agway 'discretion' to consider when setting its monthly variable rate." *Id.* The court further held that the phrase "market-related factors" in Agway's agreement was not "limited to market costs such as the cost of procuring energy" because the agreement "also expressly permitted Agway to consider its 'costs, expenses and margins' when setting prices." *Id.*[5]

Here, the Sommer Materials parallel the *Agway* language. Both agreements reference costs generally (not just "supply" costs as Mr. Sommer suggests), while also stating that rate-setting discretion would not be limited to any one factor. They also both state that the ESCO can consider its "expenses, and margins." In fact, the Sommer Materials give CleanChoice more discretion than Agway had. First, CleanChoice said the costs it considers "may include, but are not limited to" the listed costs and margin, and told customers that "[t]his list of factors is not exhaustive and no single factor will determine the rate." Ex. 4, at 3. Second, CleanChoice told customers that the way it purchases power means that the rates may not correlate with other rates in the market. *Id.* at 3 ("[Y]our variable rate may not correlate with changes in wholesale market prices or your utility's

---

[5] The Second Circuit similarly held that the phrase "business and market conditions" does ***not*** "suggest that the variable rate bears a direct relationship to [an ESCO's] procurement costs." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98 (2d Cir. 2019) (citing U.C.C. § 2-723(1) (Am. Law Inst. & Unif. Law Comm'n 2017), which states that a "market price ... shall be determined according to the [prevailing] price of such goods").

8

rates."). And third, CleanChoice warned that its rates may be higher than its ESCO competitors' and the utility because of the value-add of green energy. *Id*. at 2 ("renewable energy costs more"), 3 (CleanChoice rates "may be higher than your utility rate or other supplier's rates").

Thus, as in *Agway*, the Sommer Materials permit CleanChoice "to consider factors beyond its … costs when setting its monthly variable rates." *Agway*, 88 F.4th at 413, 417. And given the additional discretion that CleanChoice retained and green value that it provided, "the [Materials'] language leaves no doubt that [CleanChoice's] pricing decisions were permissible" and the Court should hold that the pricing language undermines Mr. Sommer's claims "[a]s a matter of law." *Id.* at 417. Indeed, a "contrary result would risk turning courts into rate-setting agencies treading on the [regulator's] mandate, an untenable outcome." *Id.* However, that is the outcome the court reached in *Weinberg v. CleanChoice*, the case noted above that Mr. Sommer's counsel filed in the Southern District of New York and cite throughout the Amended Complaint.

In *Weinberg*, the court denied dismissal of the plaintiffs' contract claims, finding that CleanChoice's pricing term was closer to the one in *Mirkin v. XOOM Energy, LLC*, than it was to Agway's. *Weinberg v. CleanChoice Energy, Inc.*, No. 23-CV-09685, 2024 WL 3446515, at *10 (S.D.N.Y. July 17, 2024). But *Weinberg* misinterpreted the contract text. The pricing term in *Mirkin*—"Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs"— was interpreted to require XOOM to set rates based ***only*** on "supply costs." *Mirkin v. XOOM Energy, LLC*, No. 18-CV-2949, 2023 WL 5200294 (E.D.N.Y. Aug. 14, 2023). By contrast, CleanChoice's pricing term clearly refers to "costs" generally (not just supply costs), adds other factors ("***plus*** CleanChoice Energy operating costs, expenses, and margins"), and then clarifies that even the expanded "list of factors is ***not exhaustive*** and no single factor will determine the

rate." Ex. 4, at 3 (emphasis added). To make CleanChoice's pricing term resemble the one in *Mirkin*, the Court would need to disregard everything after the word "plus."

*Weinberg* focused only on the fact that CleanChoice does not explicitly use the word "discretion." But courts regularly find energy rate-setting discretion without explicit use of that word. *See Nieves v. Just Energy New York Corp.*, No. 17-CV-561S, 2020 WL 6803056, at *1, 4, 6 (W.D.N.Y. Nov. 19, 2020) (defendant had discretion where pricing provision stated that "[c]hanges to the Variable Rate will be determined by Just Energy according to business and market conditions"); *see also Hamlen v. Gateway Energy Servs. Corp.*, No. 16 CV 3526, 2017 WL 892399, at *3 (S.D.N.Y. Mar. 6, 2017). And the First Circuit has similarly found contractual discretion to set rates (of interest) although the contract (a deferred compensation plan) did not use the word "discretion." *See McAdams v. Massachusetts Mut. Life Ins. Co.*, 391 F.3d 289 (1st Cir. 2004) (affirming summary judgment in a class action and holding that the "decision to account for those taxes in setting the rate of interest [was] within the literal language *affording the company the discretion to set the rate* of interest" (emphasis added)).

Here, the Sommer Materials state that "[CleanChoice] set[s] the generation prices and charges that you pay." Ex. 6, at 2. And they explicitly give CleanChoice latitude to decide what factors determine rates and leeway to consider unspecified factors since the "list of factors is not exhaustive." Ex. 4, at 3. That is the dictionary definition of discretion: "power of free decision or latitude of choice within certain legal bounds."[6]

    *b.*    *Mr. Sommer's comparators are all irrelevant and invalid.*

The Amended Complaint also relies on four inappropriate comparators to challenge CleanChoice's variable rates: (1) the regulated utility rates, (2) estimated supply costs,

---

[6] Discretion, Merriam-Webster Online Dictionary, https://www.merriamwebster.com/dictionary/ discretion (last visited Sept. 16, 2024).

10

(3) CleanChoice's fixed rates, and (4) an average of other ESCOs' rates for all product and rate types. But such comparators provide no factual basis for Mr. Sommer's breach of contract claim.

First, the Amended Complaint says that regulated utility rates are an "ideal comparator" because they "represent wholesale market prices for electricity and associated costs." Am. Compl. ¶ 46. But courts including the Second and Seventh Circuits have consistently rejected that comparison because of the fundamental difference between regulated utility rates and deregulated ESCO rates. *See, e.g.*, *Richards*, 915 F.3d at 99 ("If we were to hold private electricity suppliers liable for departing from the [utility rates], we would in effect make those [regulator]-approved rates binding on private electricity suppliers like Direct Energy. Yet the entire point of electricity deregulation was to allow the market, rather than [the regulator], to determine rates."); *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 616 (7th Cir. 2019) (the utility "price is not a market price at all; it is a regulated price" and utilities do not "participate in the general market for electricity, and thus they are not proper comparators with Direct Energy to gauge market price").

*Agway* is again instructive. There the Second Circuit held "the proffered comparisons between Agway's prices and those of the default utilities [were] legally insufficient" to support pricing claims because Agway's contract (as here) said "[s]avings are NOT guaranteed" and did not promise its rates would be lower than utility rates. *Agway*, 88 F.4th at 414, 415. So, the Court held that the customer got what she bargained for—a variable rate set at Agway's discretion. *Id.*

So too here. The terms in the Sommer Materials explicitly state that the "variable rate *may not correlate with changes in … your utility's rates*" and that "[y]our variable rate *may be higher than your utility rate* or other suppliers' rates." Ex. 4, at 3 (emphasis added). In fact, CleanChoice's July and September Mailers to Mr. Sommer included a table showing that his rates and bills would be higher than under the utility's standard offer *every month*:

11

| Average Generation Price Information | | | | |
|---|---|---|---|---|
| Monthly kWh Usage | 250 | 500 | 1000 | 2000 |
| 100% Renewable Energy Supply from CleanChoice Energy at 19.10¢/kWh | $47.75 | $95.50 | $191.00 | $382.00 |
| Standard Offer Generation Service at 13.60¢/kWh | $34.00 | $68.00 | $136.00 | $272.00 |

| Average Generation Price Information | | | | |
|---|---|---|---|---|
| Monthly kWh Usage | 250 | 500 | 1000 | 2000 |
| 100% Renewable Energy Supply from CleanChoice Energy at 15.00¢/kWh | $37.50 | $75.00 | $150.00 | $300.00 |
| Standard Offer Generation Service at 13.60¢/kWh | $34.00 | $68.00 | $136.00 | $272.00 |

Ex. 1, at 3; Ex. 4, at 3. So, Mr. Sommer cannot plausibly allege that the utility's rate is an "ideal comparator" or that any "reasonable customer, including [him]" would expect CleanChoice's rates to resemble the utility's when the Sommer Materials expressly contradict that position.

The Amended Complaint next cites a so-called "Market Supply Cost" estimated in an undisclosed way (by an unnamed person) to suggest CleanChoice failed to provide a competitive, market-based rate. Am. Compl. ¶¶ 55–65. But such a comparison is irrelevant. The Sommer Materials do not limit CleanChoice's discretion to set its costs—or to set its "supply" costs at all. *Cf. Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 175, 177–78 (2d Cir. 2019). Rather, CleanChoice could consider additional factors, including market factors and its margins. *See* Ex. 4, at 3.

The Court should also disregard the Market Supply Cost because Mr. Sommer fails to plausibly link his unexplained numbers to the relevant "market." In fact, the allegations show that those unexplained numbers do not reflect actual costs. If they did, then (according to the Amended Complaint) they would track with the utility's rates—the rates Mr. Sommer claims reflect "the wholesale cost of energy … which are the same costs ESCOs like CleanChoice incur" Am. Compl. ¶ 43. But those costs and rates do not track. *Sevugan v. Direct Energy Servs., LLC*, No. 17 C 6569, 2018 WL 4126568, at *6 (N.D. Ill. Aug. 29, 2018) (utility rates and wholesale costs were not plausible indicators of "market rates" because, among other things, they did not correlate).

The Amended Complaint's next comparator—CleanChoice's fixed rates—is equally

12

invalid. Am. Compl. ¶¶ 66–68. Mr. Sommer alleges that CleanChoice's fixed rates are "significantly lower than its variable rates," which allegedly "demonstrates that [CleanChoice] can cover both its supply and overhead costs and still make a reasonable profit." *Id*. ¶ 66. But the Second Circuit has forcefully rejected the validity of any such comparison. In *Richards*, the plaintiff argued that the ESCO "lur[ed] new customers … by offering low fixed teaser rates," only to later charge customers higher variable prices after the fixed-rate term expired. *Richards*, 915 F.3d at 99, 102. The Second Circuit explained that there is nothing misleading about charging higher variable rates after a lower, introductory price. *Id.* at 104 n. 10 (introductory rates are "quotidian pricing practices … which have long been mainstream across numerous sectors of American commerce."). Further, because Mr. Sommer's contract gave him fixed rates for only three months, he could not reasonably expect the subsequent months' rates to stay the same (as his comparison suggests). And in any event, the amount of CleanChoice's fixed rates offer no insight into whether Mr. Sommer's variable rates were set according to the discretionary factors described in the variable pricing provision. That provision does not mention fixed rates as a pricing factor, much less a benchmark. Nor does the Amended Complaint allege any facts showing that CleanChoice's fixed rates include a margin, which its variable rates could include.

The Amended Complaint's final comparator, rates from the Energy Information Administration's ("EIA") website, does relate to other ESCO rates—but not variable rates or rates for renewable energy. Am. Compl. ¶¶ 69–70. So, it is an equally invalid apples-to-oranges comparison here. This is so because Mr. Sommer received the value-add of 100% renewable energy. The purchase of RECs was listed as a price-setting factor in the Sommer Materials. Ex. 4, at 3. Further, regulators have stated that renewable power is a meaningfully different product with different price considerations: a 2018 New York Public Service Commission staff brief that is cited

13

in the Amended Complaint states that 100% renewable products like CleanChoice's are a "value-added" product that justifies price premiums. *See* NYPSC, CASE 12-M-0476, Department of Public Service Staff Redacted Initial Brief, at 71–72 (Mar. 30, 2018). That is why the Sommer Materials expressly state that renewable energy "costs more[.]" Ex. 4, at 2.

The EIA website rates are not renewable or variable rates. Rather, they are an average of ***all*** rates and product types that customers paid ESCOs (e.g, variable, fixed, low introductory, indexed, green, standard, etc.). They do not provide meaningful data about variable rates that other ESCOs charged for renewable electricity. So, they are not a sufficient comparator and do not provide any factual support for the allegation that CleanChoice failed to price per its contract.

In sum, Mr. Sommer's breach of contract claim fails because there are no factual allegations plausibly suggesting breach. The Sommer Materials describe the rate as a "variable" rate that "may vary monthly." Ex. 6, at 1. And Mr. Sommer admits he received just that: a rate that varied from month to month. Am. Compl. ¶ 18. Dismissal is warranted on his pricing claims.

2.  <u>Mr. Sommer's pricing claims each fail for independent reasons too.</u>

   a.  *Breach of Contract: No factual allegations of breach of the implied covenant.*

As part of his contract claim, Mr. Sommer also alleges that CleanChoice breached the implied covenant of good faith and fair dealing. Am. Compl. ¶¶ 152–156. To show such a breach, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of (the plaintiff) to receive the fruits of the contract." *Armstrong v. White Winston Select Asset Funds, LLC*, 648 F. Supp. 3d 230, 268 (D. Mass. 2022). Importantly, "not every breach of contract is a breach of the implied covenant of good faith and fair dealing." *Id.* at 269. "[T]he scope of the covenant is only as broad as the contract that governs the particular relationship" and cannot be premised on conduct

14

that is "expressly permitted by the agreement." *Edlow v. RBW, LLC*, 688 F.3d 26, 35–36 (1st Cir. 2012). "[T]he plaintiff has the burden of proving a lack of good faith." *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 570, 924 N.E.2d 696, 704 (2010).

Here, Mr. Sommer claims CleanChoice breached the implied covenant by exercising its rate-setting discretion in bad faith because its variable rates (i) were higher than "its actual costs plus a commercially reasonable margin," (ii) were higher than the utility's rates, and (iii) because CleanChoice did not disclose how it calculated variable rates. Am. Compl. ¶¶ 154–56. However, there was no obligation whatsoever in the Sommer Materials to charge variable rates based exclusively on "actual costs plus a commercially reasonable margin" nor was there an obligation to charge variable rates that were equal to or lower than the utility's rates. *See generally* Ex. 4; Ex. 6. Indeed, the Sommer Materials stated that CleanChoice's variable rates would be based on a non-exhaustive list of factors including "a number of costs . . . ***plus*** operating costs, expenses, and margins" and that the variable rates would be ***higher*** than the utility's. Ex. 4, at 2–3. Nor does the contract require CleanChoice to disclose how it calculated the rate. And the implied covenant cannot "create rights and duties not otherwise provided for in the existing contractual relationship." *T.W. Nickerson, Inc.*, 456 Mass. at 570. Thus, Mr. Sommer's implied covenant claim fails as a matter of law. *See Edlow*, 688 F.3d at 35 (defendant had no contractual duty to provide plaintiff with amenities by closing date, so could not have breached the implied covenant); *see also Speleos v. BAC Home Loans Servicing, L.P.*, 755 F. Supp. 2d 304, 312 (D. Mass. 2010) (dismissing implied covenant claim based on failure to modify the plaintiffs' loan where defendants "had no obligation" under the contract to modify the loan).

b.      *Unjust Enrichment: Fails on multiple grounds.*

Mr. Sommer's unjust enrichment claim fails because "there is a valid contract that defines

the obligations of the parties." *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 332 F. Supp. 3d 446, 472 (D. Mass. 2018). "'Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment.'" *Id.* (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006)); *see also Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp. 2d 23, 29 (D. Mass. 2006), *aff'd*, 496 F.3d 1 (1st Cir. 2007) (because "a valid, express contract governed the relationship between Ruiz and defendants, plaintiff's claim[] for unjust enrichment … will be dismissed."). Moreover, unjust enrichment is an "equitable cause[] of action which [is] available to plaintiffs who lack adequate remedies at law." *Ruiz*, 447 F. Supp. 2d at 29.

While alternative pleading is permitted, the Amended Complaint does not plead any alternative factual scenario in which there is no contract between the parties. Where, as here, there is a valid and enforceable written contract that allows for an adequate remedy at law, any unjust enrichment claim must fail. *See Ruiz*, 447 F. Supp. 2d at 29; *see also Salls v. Digital Fed. Credit Union*, 349 F. Supp. 3d 81, 89–90 (D. Mass. 2018) (even when pleaded in the alternative, no unjust enrichment claim permitted when an enforceable written contract governs).

3.  Mr. Sommer's Chapter 93A claim fails as a matter of law and is time-barred.

    a.  *Chapter 93A claim fails because CleanChoice's statements were not deceptive.*

Mr. Sommer also asserts a Chapter 93A claim based on renewable energy representations. Am. Compl. ¶¶ 159–184. Specifically, he takes issue with CleanChoice's statements that: (i) it offers "100% clean, pollution-free energy, (ii) it "will source wind and solar power from farms in your region," and (iii) customers "will be consuming electricity from clean, renewable sources," when "in fact CleanChoice supplied the same brown energy as the utility." *Id.* ¶ 163. Like the pricing claims, these claims fail because the Sommer Materials accurately disclosed the basis for CleanChoice's renewable energy statements, and no reasonable consumer would be misled.

16

To plead a Chapter 93A claim, Mr. Sommer must allege: (1) that CleanChoice committed an unfair or deceptive act or practice; (2) that such act or practice occurred in the conduct of trade or commerce; (3) that he suffered an injury; and (4) that CleanChoice's unfair or deceptive conduct caused such injury. *See Rafferty v. Merck & Co.*, 479 Mass. 141, 161 (2018). The allegations must "illustrate something beyond a mere good faith dispute, failure to pay, or simple breach of contract." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013). In determining whether conduct is "unfair," courts consider: "(1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers[.]" *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) (ellipses omitted). Conduct is deceptive for Chapter 93A purposes "if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted." *Zielinski v. Citizens Bank, N.A.*, 552 F. Supp. 3d 60, 69 (D. Mass. 2021) (internal quotations omitted).

The Sommer Materials show that CleanChoice did not misrepresent the renewable nature of the power it sells. *See supra* at 3–7. They note that the grid is a mix of various energy sources, "primarily from fossil fuels like coal, natural gas, and oil." Ex. 6, at 2. The September Contract even had a table showing that New England's grid mix was 91.250% non-renewable:

| | Wind | Captured Methane | Solar Photo-Voltaic | Solid Waste | Steam | Wood/ Biomass | Other Renewables | Total |
|---|---|---|---|---|---|---|---|---|
| Your Plan - Renewables | 99.000% | 0.000% | 1.000% | 0.000% | 0.000% | 0.000% | 0.000% | 100.000% |
| NEISO System Fuel Mix - Renewables | 2.000% | 0.040% | 0.430% | 3.070% | 0.000% | 3.210% | 0.280% | 8.750% |

| | Coal | Fuel Cells | Gas | Gas and Oil | Nuclear | Oil | Conventional Hydro | Total |
|---|---|---|---|---|---|---|---|---|
| Your Plan - Non-Renewables | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% |
| NEISO System Fuel Mix - Non-Renewables | 3.600% | 0.000% | 48.540% | 0.000% | 29.560% | 1.820% | 7.480% | 91.250% |

*Id.* The Sommer Materials also expressly stated that renewable energy would not be delivered to Mr. Sommer's service address from a specific generation facility, but rather that he would receive

17

renewable energy through the RECs CleanChoice purchased to match his usage:

> **Product Information:** 100% of your electricity usage will be produced by wind and solar generation facilities. Electricity is the product of a mix of energy sources that is delivered over a system of wires. You will not have electricity from a specific generation facility delivered directly to your service address, but CleanChoice Energy ensures that your electricity usage is offset by the generation of energy from renewable energy sources on an annual basis. The energy your home uses will be paired with renewable energy sources through the purchase of Renewable Energy Certificates. For customers in your region, CleanChoice Energy procures renewable energy certificates from the following states: MA, NY, NH, CT, ME, RI, PA, and VT. Other offers may vary.

Ex. 4, at 3; *see also* Ex. 6, at 2–3. *Id.* These disclosures are entirely accurate and are more numerous and detailed than those that (incorrectly) survived dismissal in *Weinberg*.

Additionally, CleanChoice's statements about renewable energy comply with the FTC's Green Guides, which provide regulatory guidance about renewable energy marketing and state that: "A marketer should not make unqualified renewable energy claims … ***unless the marketer has matched such non-renewable energy use with renewable energy certificates***." 16 C.F.R. § 260.15(a) (emphasis added). Here, the Amended Complaint does not allege that CleanChoice ever failed to match its electricity sales with purchases of RECs.

Moreover, Mr. Sommer's alleged belief that CleanChoice was promising to provide renewable energy "directly to the customer's home," Am. Compl. ¶ 8, through the same power lines he always used, instead of by purchasing RECs, not only contradicts the materials he received, but is also impossible and unreasonable. *See Verzani v. Costco Wholesale Corp.*, No. 09 Civ. 2117, 2010 WL 3911499, at *2–3 (S.D.N.Y. Sept. 28, 2010). As the Sommer Materials explain, "[e]lectricity is the product of a mix of generation energy sources that is delivered over a system of wires" and CleanChoice cannot control the flow of electrons to a house any more than the regulated utility can. Ex. 6, at 2–3. CleanChoice accurately disclosed the basis for its renewable energy claims, and no reasonable consumer would have been misled.

 b. *Mr. Sommer's Chapter 93A claim is barred by the statute of limitations.*

Mr. Sommer's Chapter 93A claim also fails because it is subject to a four-year statute of limitations. Mass. Gen. Laws ch. 260, § 5A; *O'Brien v. Deutsche Bank Nat'l Trust Co.*, 948 F.3d

31, 35 (1st Cir. 2020). In Massachusetts, "[a] cause of action accrues when 'the plaintiff can file suit and obtain relief.'" *Id.* (quoting *Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am. LLC*, 794 F.3d 200, 203 (1st Cir. 2015)).

Here, the Amended Complaint alleges the facts establishing CleanChoice's limitations defense. *See* Am. Compl. ¶¶ 159–184. *See Verrier v. Beth Israel Deaconess Hospital-Plymouth, Inc.*, 706 F. Supp. 3d 142, 145 (D. Mass. 2023) ("[A] defendant can assert a 'statute of limitations defense in a motion to dismiss if the facts establishing the defense are clear on the face of the plaintiff's pleadings.'"). It alleges that CleanChoice violated Chapter 93A through a laundry list of purported acts and/or omissions involving misrepresentations and inadequate disclosures in its form customer contract and marketing materials. *See* Am. Compl. ¶ 163. Mr. Sommer further alleges that CleanChoice purportedly ***"knew at the time it signed up"*** Mr. Sommer that (1) "the price of a customer's energy supply was a material factor in choosing CleanChoice;" (2) "a customer's primary alternative to CleanChoice was the customer's local utility;" and (3) "CleanChoice's variable rates for electricity were consistently substantially higher than Plaintiff and prospective customer's local utility rate," and that CleanChoice's alleged omissions and misrepresentations were material to prospective customers. *Id.* ¶¶ 175–77. Thus, according to the Amended Complaint, the purported violations admittedly occurred at or around the time Mr. Sommer received marketing materials from CleanChoice, signed up for CleanChoice's variable rate electricity, and was first charged a variable rate by CleanChoice in 2019. *Id.* ¶¶ 159–184; *see also* Ex. 1–6. Further, the Amended Complaint alleges no facts to excuse the delay in filing; just a conclusory recitation of various tolling principles, which is insufficient. *Twombly*, 550 U.S. at 555.

Mr. Sommer did not sue until July 18, 2024, nearly five years after this claim accrued, which is too late. *See generally* Am. Compl.; *See LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d

19

507, 509 (1st Cir. 1998) ("Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred.").

Mr. Sommer's allegations that the statute of limitations is tolled pursuant to the continuing violation doctrine, fraudulent concealment, estoppel, and the discovery rule all fail for the same reasons. *See* Am. Compl. ¶¶ 97–105. First, as Mr. Sommer concedes, CleanChoice's purported violations occurred around the time Mr. Sommer received marketing materials from CleanChoice and decided to sign up for electricity, so there can be no continuing breach. *See id.* ¶¶ 159–184. Mr. Sommer's Chapter 93A claim is based entirely on CleanChoice's representations at the outset in the Sommer Materials, meaning Mr. Sommer knew or should have known of any alleged breach at or around the time he entered into his contract with CleanChoice in 2019. Second, the Sommer Materials show that CleanChoice did ***not*** conceal or misrepresent the nature of the renewable energy it sells. *See supra* at 3–7. Again, they explicitly stated that the energy delivered to Mr. Sommer's residence would be a renewable/non-renewable grid mix and that he would receive renewable energy through RECs. Ex. 6, at 2–3; Ex. 4, at 3. Mr. Sommer received electricity consistent with those representations and has not pled any other facts as the basis for a fraud or fraudulent concealment claim—much less facts alleged with the particularity required by Federal Rule of Civil Procedure 9(b). *See Cost v. FCA US LLC*, 542 F. Supp. 3d 83, 101–02 (D. Mass. 2021). His attempt to circumvent Chapter 93A's statute of limitations fails.

## CONCLUSION

CleanChoice respectfully requests that the Court grant its Motion in full and dismiss the Amended Complaint in its entirety under Rules 12(b)(6) and 12(b)(1), with prejudice.

Dated: November 8, 2024

*/s/ John A. Shope*
John A. Shope (BBO # 562056)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210
Telephone: (617) 832-1233
Facsimile: (617) 832-7000
jshope@foleyhoag.com

Michael D. Matthews, Jr.*
Diane S. Wizig*
Renee T. Wilkerson*
Louise R. Grable*
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
matt.matthews@mhllp.com
diane.wizig@mhllp.com
renee.wilkerson@mhllp.com
louise.grable@mhllp.com

*Attorneys for Defendant CleanChoice Energy, Inc.*

*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the 8th day of November, 2024 on all counsel of record through the ECF system.

/s/ *John A. Shope*
John A. Shope

21